PEMISCOT COUNTY BANK *et al. v.* CENTRAL-STATE NAT.
BANK *et al.**

(*Jackson.* April Term, 1915.)

1. BANKS AND BANKING. "Cashier." Authority.

A "cashier" of a bank is its chief executive officer, and as such
is held out by the institution as having authority to act in
accordance with the usage and practice obtaining in the conduct
of the business by banking institutions, and, so acting, he will
bind the bank in favor of third persons who possess no knowl-
edge to the contrary, or as to limitations on his power. (*Post,
p.* 156.)

Cases cited and approved: Northern Bank v. Johnson, 45 Tenn.,
88; Water Co. v. Bank, 123 Tenn., 364.

2. BANKS AND BANKING. Cashier. Authority to issue drafts.

Though a bank cashier has power to issue and sign drafts drawn
on funds of his bank on deposit with a correspondent bank, he
has no implied power to draw such drafts in his own favor, or
in favor of a creditor in payment of his own debt, and the
acceptor in such case is charged with notice. (*Post, p.* 156.)

Cases cited and approved : Campbell v. Manufacturers' Nat. Bank,
67 N. J. Law, 308; Rochester, etc., Turnpike Co. v. Pavious, 164
N. Y., 281; Anderson v. Kissam, 35 Fed., 699; Gale v. Chase Nat.
Bank, 104 Fed, 214; St. Charles, etc., Bank v. Edwards, 243 Mo.,
553; Home Sav. Bank v. Otterbach, 135 Iowa, 157; Debaca v.
Higgins, 143 Pac., 832.

Cases cited and distinguished: Tisdale v. Tisdale, 34 Tenn., 596;
Goshen Nat. Bank v. State, 141 N. Y., 379; Bank of New York
v. American, etc., Co., 143 N. Y., 559; Hanover Nat. Bank v.
American Bank, etc., Co., 148 N. Y., 612; Hathaway v. Dele-
ware Co., 185 N. Y., 368; Lanson v. Beard, 94 Fed., 30.

---

*For cases passing upon right of one who takes commercial paper
of corporation in payment of, or security for, an individual debt
of an officer, see note in 31 L. R. A. (N. S.), 169.

Bank v. Bank.

3. **BANKS AND BANKING. Cashier. Issuance of draft. Dual relation.**

Where a bank cashier, who was also president of a store company, drew a draft on his bank, signed by himself as president of the company, in payment of a debt due from the company, and then drew a draft to order of the bank holding the store draft for collection, with notice of the dual relation, on the correspondent bank of the cashier's bank, and the draft was paid, the payees of the two drafts were not put on notice which would render them liable to refund the money to the cashier's bank on insolvency; the cashier embezzling the money and issuing the drafts without funds. (*Post, p.* 163.)

4. **BANKS AND BANKING. Cashier. Issuance of .drafts. Dual relation.**

A bank cashier is not forbidden by banking custom from drawing a draft in favor of a corporation of which he is president. (*Post, p.* 164.)

Cases cited and approved:   Thompson v. Clydesdale Bank, 3 A. C., 282; Ball v. Shepard, 202 N. Y., 247.

Cases cited and distinguished:   Mining Co. v. Bank, 10 Colo. App., 339; Cheever v. Pittsburg, etc., R. Co., 150 N. Y., 59; Bank v. Butler, 113 Tenn., 574; Orr v. South Amboy, etc., Co., 113 App. Div., 103.

---

## FROM SHELBY.

---

Appeal from the Chancery Court of Shelby County. —F. H. HEISKELL, Chancellor.

JOHN JOHNTSON and T. K. RIDDICK, for appellants.

R. P. CARY, G. J. McSPADDEN and SIVLEY & EVANS, for appellee.

MR. JUSTICE WILLIAMS delivered the opinion of the Court.

This case stands upon bill of complaint and demurrer.

The bill was filed by the insolvent Pemiscot County Bank, of Caruthersville, Missouri, and its receiver, against defendant bank, hereinafter called the Memphis Bank, and Abston, Wynne & Co., a mercantile firm of Memphis, for the purpose of recovering the amount of a draft drawn by one A. C. Tindle, cashier of the complainant bank, upon that bank's correspondent, the National Bank of Commerce, of St. Louis, Mo., as follows:

                "Pemiscot County Bank.
"No. 65805.            Caruthersville, Missouri,
                        "Jan'y 15, 1913.

"Pay to the order of Central State Bank & Trust Co. ten hundred twenty-three and 47/100 dollars ($1,023.47).

                        "A. C. TINDLE, Cashier.
"To National Bank of Commerce,
                        "St. Louis, Mo."

Stamped on the face:

"Paid Jan'y 18, 1913.   The National Bank of Commerce, in St. Louis."

Indorsed on the back by the payee bank.

The Famous Store Company, of Caruthersville, Missouri, purchased merchandise of Abston, Wynne & Co., and executed to that Memphis firm its draft, payable

at the Pemiscot County Bank, the depository bank of the Famous Store Company, which draft was deposited for collection in the Central-State Bank & Trust Company (now Central-State National Bank). The Memphis Bank forwarded the draft to the Pemiscot County Bank for realization, and the above St. Louis exchange was forwarded in settlement to the Memphis Bank.

A. C. Tindle was the president and dominating and controlling officer of the Famous Store Company, a body corporate, and the draft of that company, sent Abston, Wynne & Co., was signed in the name of the Store Company, by A. C. Tindle, President. The Memphis firm knew, or is chargeable with knowledge, of the relationship sustained by Tindle to the Store Company. It is alleged that no consideration was paid or passed to the Pemiscot County Bank for the draft.

The bill alleges that Tindle wrongfully, fraudulently, and without authority of the Pemiscot County Bank, of which he was cashier, drew the St. Louis exchange above set forth, along with various other like instruments; that this, with the other amounts embezzled and stolen by Tindle, totaled $300,000; and that the above draft was paid in the above mode to defendants, who are sought to be held to a repayment of the amount of the same.

The affairs of the Pemiscot County Bank were placed in the hands of a receiver in July, 1914, and the bill of complaint was filed in August thereafter—about seventeen months after the date of the above transaction.

The theory and allegation of complainants is that Abston, Wynne & Co. knew, or were charged with knowledge, that this draft was being used in the payment of an indebtedness in which Tindle was interested, and are as much liable to respond as if Tindle had drawn the draft in his own favor, or in favor of his individual creditor, in payment of his personal indebtedness.

The above is a summary of the bill of complaint as same was construed and argued at the bar of this court by complainants' counsel and the counsel of defendants.

The demurrer goes upon the theory that the draft was drawn, transmitted, and accepted in due course of business, and that its execution was within the implied power of Tindle as cashier, and therefore that it should be treated as imparting no notice to its takers of anything affecting its validity.

The cashier of a bank is its chief executive officer, and as such is held out by the institution as having authority to act in accordance with the usage and practice obtaining in the conduct of business by banking institutions; and, so acting, he will bind the bank in favor of third persons who possess no knowledge to the contrary, or as to limitations on his powers. *Northern Bank* v. *Johnson*, 45 Tenn. (5 Cold.), 88; *Water Co.* v. *Bank*, 123 Tenn., 364, 369, 131 S. W., 447; 1 Michie, Banks and Banking, section 102, p. 713.

Among the powers ordinarily inhering in the office or position of cashier is that of issuing and signing

drafts drawn on funds of his bank on deposit with a correspondent bank. 1 Morse, Banks and Banking, section 154; 1 Michie, Banks and Banking, section 102, p. 710.

By way of exception to this rule of law, a cashier, as such, has no implied power to draw such drafts in his own favor, or in favor of a creditor in payment of his own debts; and a person who accepts a draft, drawn by a cashier, payable to himself, or used in payment of the individual indebtedness of himself, is put on notice that the fiduciary is discharging his own obligation with the funds of his principal, the bank, and the recipient is not to be treated as an innocent holder of the draft or its money product, and may be called to account for the proceeds by the bank. As Lord Denman observed of commercial paper so drawn: ''It bears its death wound on its face.'' The duty of the recipient is to make inquiry to ascertain whether, there being a lack of inherent power, there existed authority on the part of the cashier from his corporate principal, by way of special or express grant, or by way of implication from a course of like conduct for a long time, acquiesced in by the bank. *Campbell* v. *Manufacturers' Nat. Bank,* 67 N. J. Law, 308, 51 Atl., 498, 91 Am. St. Rep., 438; *Rochester, etc., Turnpike Co.* v. *Paviour,* 164 N. Y., 281, 58 N. E., 114, 52 L. R. A., 790; *Anderson* v. *Kissam* (C. C.), 35 Fed., 699; *Gale* v. *Chase Nat. Bank,* 104 Fed., 214, 43 C. C. A., 496; *St. Charles, etc., Bank* v. *Edwards,* 243 Mo., 553, 147 S. W., 978; *Home Sav. Bank* v. *Otterbach,* 135 Iowa, 157, 112 N. W., 769, 124

Am. St. Rep., 267; *Debaca* v. *Higgins* (Colo.), 143 Pac., 832, L. R. A., 1915B, 1091; Michie, Banks and Banking, section 117; Zane, Banks and Banking, 120.

This doctrine has its foundation, to use the language of Judge Caruthers in *Tisdale* v. *Tisdale,* 34 Tenn. (2 Sneed), 596, 64 Am. Dec., 775, "in that profound knowledge of the human heart, which dictated that hallowed petition, 'Lead us not into temptation, but deliver us from evil,' and that caused the announcement of the infallible truth that 'a man cannot serve two masters.' "

While the above doctrine may now be considered to be widely received and fairly firmly fixed, its establishment has not been without hesitation on the part of some of the greatest judicial tribunals. For a time, if, indeed, not until the present, it seems that the court of appeals of New York was hesitant to accept it as altogether sound. In *Goshen Nat. Bank* v. *State,* 141 N. Y., 379, 36 N. E., 316, it appeared that a county treasurer was also the cashier of the Goshen National Bank. He signed as cashier and forwarded a draft on that bank's New York City correspondent for the amount of the taxes due from him as treasurer of the county to the comptroller of the State of New York, thus embezzling the funds of his bank. That eminent jurist, Rufus W. Peckham, speaking for the court, said:

"Upon the question whether the form of the draft constituted notice to the State or its officer that the funds of the claimant were being used by the cashier to pay his private debt, we think that no notice of such

fact was conveyed to the comptroller by this form of draft.

"It is the right and duty of the cashier of a bank to sign the drafts drawn in its behalf upon its corresponding bank. This is part of the ordinary duties of such an officer, and affirmative evidence of his power to sign drafts appears in this record, and it also appears that he had the right to draw such draft for himself upon the same terms that he would have had in case of a third party, which means, I assume, upon payment to the bank of the amount of the draft.

"There was an apparent authority to draw the draft. It appeared to have been drawn in the course of the employment of the cashier, and it was an act which was within the scope of his general powers.

"We do not think that, in the case of a bank draft so drawn, the party receiving it would be charged with the duty of inquiry, or with notice of the fact that the cashier had not paid for the draft, and that he was, therefore, using the funds of the bank to pay his private debt. He would only be so using them in case he did not pay for the draft, and its form might be the same, even if he had paid for it in full. We think there is nothing unusual or suspicious in this form of making the draft payable direct to the creditor of the cashier, nor any notice that in so doing the bank's funds have been improperly used. Bank or cashier's drafts are used so enormously at the present time in the payment or settlement of debts and in other commercial transactions that they have almost acquired the character-

istics of money.  So long as they are drawn on behalf of a solvent bank and upon a solvent drawee, and signed by one of the officers usually signing such instruments, they are regarded by the commercial community very much the same as so much cash, and the fact that the draft was drawn by a cashier directly in favor of his own creditor, and sent to that creditor by him, would not naturally give rise even to the suspicion that there was anything irregular, fraudulent, or wrong in the conduct of the cashier.  The presumption would be that he had performed his duty and paid for the draft, and that it therefore was his property."

We are in doubt as to whether that case is still, without limitations, the law in New York on the point here in contest; this, in view of the comments of Judge Peckham himself on the case in the later case of *Bank of New York* v. *American, etc., Co.,* 143 N. Y., 559, 565, 38 N. E., 713, and of the ruling in *Hanover Nat. Bank* v. *American Bank, etc., Co.,* 148 N. Y., 612, 42 N. E., 72, 51 Am. St. Rep., 721, on the one hand, and the citation and quotation, with seeming approval, of the case by the same court in its unanimous opinion in *Hathaway* v. *Delaware County,* 185 N. Y., 368, 78 N. E., 153, 13 L. R. A. (N. S.), 273, 113 Am. St. Rep., 909, on the other hand.  However that may be, it is certain that the court in the Goshen National Bank Case took the position it did because it recognized the fact that bank drafts as a medium of exchange are by the commercial world treated as closely approximating currency, and appreciated that as little clouding as possible, by re-

strictive rules of law, of such use of bank drafts, is in the interest of the commerce of the country.

In the case of *Lamson* v. *Beard,* 94 Fed., 30, 36 C. C. A., 56, 45 L. R. A., 822, it appeared that the president of a bank, Cassatt, instead of the cashier, was its principal executive officer; that he had entire control of its affairs, and drew drafts on the bank's funds in the hands of its correspondent bank in Chicago, payable to a commission firm in Chicago, on account of margins on speculative investments made through the firm by the president. The drafts were signed in the name of the drawer bank by the president, as such, payable to the firm, and were on receipt credited to the president's personal account in the firm's bank of deposit, which last-named bank presented them for payment at the correspondent bank. The firm knew of the president's official connection with his bank, and that he was losing money in the series of speculations carried on through them; but the firm made no inquiry of the other officers or directors of that bank to learn whether the president was furnishing his own funds in the payment for the drafts, or whether his so issuing the drafts was authorized by the bank. It was held that the commission firm, in receiving the drafts and their avails, was chargeable with notice of misappropriation by Cassatt to support such margins, and judgment was awarded the receiver of the bank for the amount of the drafts, with interest. After stating that a general authority given to an agent to do an act in behalf of the principal does not extend to a case where it appears

132 Tenn.11

that the agent himself is the person interested on the other side, and that, if such power is intended to be given, it must be expressed in language so plain that no other interpretation can rationally be given it, it being against the law of reason that an agent should be intrusted with power to act for his principal and for himself at the same time, the court further said:

"If, for instance, Cassatt had sent to the plaintiffs in error money of the bank, instead of drafts, advising them that it belonged to the bank, there could be no question of their liability to make restitution; and in what respect is their position better  .  .  .  than it would be on the facts supposed, even conceding that the drafts sent them were the same, or 'almost the same,' as money? The drafts bore proof on their face  .  .  . that they were not drawn in the course of the bank's business, but in discharge of individual liabilities of the president of the bank to themselves, they, of course, understood. They therefore knew that, unless there had been conferred upon Cassatt an unusual and special authority, like that given the cashier in *Goshen Nat. Bank* v. *State,* supra, to sign and issue drafts of the bank in his private transactions, the paper sent them was unauthorized, and that for the proceeds thereof they would be liable to the bank or its representatives."

This case of *Lamson* v. *Beard* was carried to the supreme court of the United States, where it was argued before a full bench of that court in November, 1900, and evidently because of its difficulty in the view

of that court it was in the May following ordered to be reargued, but before the date for reargument was reached the cause was dismissed (February, 1902) on stipulation of counsel, so that it did not come to decision in that court. 186 U. S. (mem.), 22 Sup. Ct., 939, 46 L. Ed., 1265.

In this state of the law, and in this attitude of the court in respect to the doctrine above stated, we are asked to take a step further in advance, and to hold that where the cashier of a bank issues a draft of his bank on its correspondent, over his signature as cashier, to the collecting bank or agency of a creditor of a mercantile corporation in honoring that corporation's draft or check on the bank, or for a note payable there, the same rule as to imputed notice of embezzlement shall apply.

The matter may be presented in sharper outline if, purely for the purpose of test, the case be conceded to be that the draft was drawn directly in favor of Abston, Wynne & Co., as payees, as a way of the Pemiscot County Bank's paying the draft on it issued to the Memphis firm by the Famous Store Company. May the doctrine be fairly or justly extended, so as to hold the Memphis firm to have been put on inquiry as to the cashier's authority by what would thus appear on the face of the bank's draft?

In our opinion it cannot, and we are entirely satisfied in declining to so hold.

The Famous Store Company was an entity distinct from Tindle; it was accepted and dealt with as a cus-

tomer by the bank as such entity. To the extent that
Tindle, as president of the Store Company, controlled
its affairs, it would have cast at least a shade of sus-
picion on the bank in the community, had that company
failed or refused to do business with the bank of which
Tindle was cashier. It would be an undue stretch to
hold that the drawing of a draft on a correspondent
city bank by Tindle as cashier in favor of the Store
Company or its creditor imparted notice to the cred-
itor on reception that Tindle was unfaithful in his trust
as cashier. Abston, Wynne & Co. were not his indi-
vidual creditors. We must assume, even if Tindle
dominated the Store Company, that there were direct-
ors and agencies in that company who were true to
their trusts, and would refuse to join Tindle in looting
the bank in its behalf, and who would, at least in the
view of the trading public, operate to deter Tindle from
such peculation for that company's benefit.

The counsel of the appellee cite no authority which
supports such an advanced position; they concede that
after diligent search they have been unable to find any.

It is apparent that appellees must maintain the posi-
tion that Tindle, as cashier, and therefore as chief ex-
ecutive officer, of the bank, was without power or au-
thority to act in accordance with the usage, practice,
and course of business of banking institutions in draw-
ing drafts in favor of corporations in which he was also
an officer. Touching the principle bearing upon that
point, it was said in *Mining Co.* v. *Bank,* 10 Colo. App.,
339, 347, 50 Pac., 1055, 1058, as follows:

"It is contended that the note appeared upon its face to be executed by a corporation, and to a corporation of both of which the same person was president, and that this was sufficient notice to put J. B. Wheeler & Co. and each subsequent transferee upon inquiry as to all matters affecting its validity. . . . In any event, the argument depends for its force upon the theory that where a note is executed by one corporation to another, and the same person is president of both, it is *prima facie* void. These premises are not correct, and the argument therefore falls to the ground. However much such a circumstance may render it obligatory upon a court to scrutinize closely the *bona fides* of a transaction in certain cases, it by no means follows that it creates a presumption as to the invalidity of the paper, either as to want of authority to execute it, or of consideration. . . . The note did not disclose any suggestion that the maker was without authority to make it, or that it was for the benefit of any one of the officers making it."

See, also, *Cheever* v. *Pittsburg, etc., R. Co.,* 150 N. Y., 59, 44 N. E., 701, 34 L. R. A., 69, 55 Am. St. Rep., 646 (cited and quoted with approval in *Bank* v. *Butler,* 113 Tenn., 574, 83 S. W., 655), and *Orr* v. *South Amboy, etc., Co.,* 113 App. Div., 103, 98 N. Y. Supp., 1026.

To enlarge the above exception to the general rule as to the power of a cashier to issue bank drafts, so as to include in that exception drafts or cashier's checks drawn in favor of such corporations or its creditors, would be to seriously hamper commercial transactions.

The settlements made with such paper as exchange vastly exceed in number and amount those made with currency. Sound policy dictates that no further burden be placed by the courts on such paper to the embarrassment of commerce. The free flow and the amplest acceptance by the trading public of such paper should be facilitated by the law, not further embarrassed or hindered. Judge Peckham well said that bank or cashier's drafts are used so enormously at the present time in payment of debts and in settlements that they have almost acquired the characteristics of money, and are regarded by the commercial community as so much cash. True, money bears no "earmarks" that may give rise to suspicions on the part of the recipient as to the manner in which it was obtained by one who pays it (*Thompson* v. *Clydesdale Bank* [1893], 3 A. C., 282, 69 L. T. N. S., 156; *Ball* v. *Shepard,* 202 N. Y., 247, 95 N. E., 719; *Goshen Nat. Bank* v. *State,* supra), while bank drafts may, as we have observed, still the better policy does not look towards the courts adding to such drafts other marks of dissimilarity to currency.

It is more reasonable and just to place upon the directors of a bank the hazard of guarding their institutions from embezzlement by the cashier, who is chosen, and may be caused to be adequately bonded, by them, than to shift the perils incident to his wrongdoing against the institution to the public which is without voice in that regard. Such dishonesty is, fortunately, a thing sporadic, and its results, practically speaking, are confined to a limited territory and to com-

paratively few persons; whereas, further restrictive rules would affect the currency of such commercial paper, measureless in volume, every business day of the year.

As was said in *Cheever* v. *Pittsburg, etc., R. Co.,* supra, in reply to a suggestion that a similar ruling would open an easy way for the perpetration of frauds:

"It is more reasonable and just to assume that corporations will be able to protect themselves by proper vigilance from the dishonesty of their own officers than to impute to parties who have taken the paper for value, ignorant of its origin, constructive knowledge of the facts upon such circumstances as exist in this case."

If the results of delinquency or lack of diligence on the part of the management or supervising agencies of a bank are to be shifted to and borne by the public, then from the standpoint of economics this should be done by way of an undisguised tax levied on the holdings of the public, rather than by way of further depreciating and clouding a medium of exchange so widely in use.

We do not find it necessary to discuss that phase of the case presented by the fact that Abston, Wynne & Co. surrendered to the Pemiscot County Bank the check of the Store Company when the draft on the St. Louis correspondent was transmitted, and as to how far value was given thereby; nor need we comment on how far unfairness might be involved in holding the Memphis firm to constructive notice and to account, since in usual course of business that firm in all likelihood

would never see the St. Louis exchange transmitted to the Memphis Bank in payment of the Store Company's check.   That draft would be sent by the Memphis Bank to the St. Louis Bank for realization and there held as a voucher.

We hold that the principle applicable, where a bank cashier executed the bank's obligation to himself as payee and presents it in payment of his own obligation, is not to be extended so as to cover a case such as is presented on this record, under the doctrine of constructive notice of a lack or palpable excess of power on the part of the cashier who drew the draft.

The result is that the decree of the chancellor must be reversed; but in justice to that able official it should be explained again that the bill of complaint, as construed and put by counsel to this court, differed from the bill as drafted and filed, and as it may have been considered by the chancellor, in the court of trial. The course of counsel in thus fairly phasing the case for test on appeal is most commendable.

Reversed.