Bank of Taylorsville, Appellee, v. Charles R. Blyth et al., Trading as Blyth & Company, Appellants.

Gen. No. 36,019.

Opinion filed December 30, 1932. Rehearing denied and opinion modified January 19, 1933.

CHAPMAN & CUTLER, for appellants; CHARLES M. THOMSON, of counsel.

LOUCKS, ECKERT & PETERSON, for appellee.

MR. JUSTICE SCANLAN delivered the opinion of the court.

In a trial before the court in an assumpsit suit, there was a finding for plaintiff and damages were assessed at $2,997.50. From a judgment for that amount defendants have appealed.

Defendants are investment bankers and brokers, doing business in Chicago. Plaintiff bank is located at Taylorsville, Kentucky. In April, 1929, E. A. Reid, its cashier, purchased, through the defendants, 100 shares of Sinclair Oil stock for $4,004.27. Defendants then drew a draft on Reid for that amount and deposited it, with the certificate for the stock attached, in the Continental Illinois Bank & Trust Company, of Chicago, for collection. That bank credited the account of defendants with the amount of the draft, with the customary understanding that if the draft was not paid the bank would charge the amount of the same against defendants' account, and with the further understanding that if the draft was paid the payment would be noted on the books of the bank, but defendants would not be notified of the payment. Plaintiff admitted that upon the receipt of the draft Continental bank attached it and the stock certificate to what is known as a collection letter, the latter being in duplicate, and sent the draft, the certificate and the duplicate collection letters by registered letter addressed to the Bank of Taylorsville, at Taylorsville, Kentucky, and that the duplicate collection letters contained the following: "We enclose for collection and returns . . . draft on E. A. Reid . . . amount due $4004.27 . . . depositor, Blyth & Co. . . . 100 Sinclair Oil Attd. with Exch. Wire non payment. Continental Illinois Bank and Trust Company." Shields, the messenger of plaintiff bank, obtained the registered letter at the post office at Taylorsville and delivered it to Reid at the bank, who then drew a draft of plaintiff bank on its correspondent, National Bank of Kentucky, at Louisville, in favor of Continental bank for $4,004.27. This draft was signed by Reid as cashier of plaintiff bank. He then attached the draft to one of the duplicate collection letters that had been received from the Chicago bank, placed them in an envelope of plaintiff bank, addressed to Continental bank, and

put the same in the outgoing mail box of the bank, and then Shields, in the course of his duties, carried the letter to the post office and mailed it. Prior to the purchase of the Sinclair stock Reid had bought securities through defendants "as many as eight or ten times over a period of three or four months," and in each of the transactions the same procedure that we have stated was followed, and in each transaction Reid made payment to plaintiff bank for the amount of the draft of that bank used, but on the occasion in question, while he retained the stock certificate, he failed to make payment to plaintiff bank, left Taylorsville, taking with him the last draft, and a few days later he returned it to plaintiff bank by mail, with the following written by him upon its face, "This is the amount I am short." The Fidelity & Deposit Company of Maryland had issued a surety bond to plaintiff bank conditioned for the faithful performance by Reid of his duties as cashier, and the bank presented its claim to the surety company for the amount of the default and that company reimbursed the bank in full for its loss and took an assignment of the claim. Later a petition in bankruptcy was filed against Reid and in the proceedings the surety company received $1,194.98 on its claim, and the court, in assessing the damages in the instant suit, deducted that amount.

The officers of plaintiff bank were E. D. Bourne, president; L. W. Ross, vice president; Edwin A. Reid, cashier, and B. O. Wigginton, assistant cashier. E. D. Bourne organized the bank in 1882 and for many years was active in the management of the same, but at the time in question, while he was at the bank daily, "he did not attempt to do any book work," but when Reid and the assistant cashier were both out he would handle the securities that came to the bank with drafts for collection, and occasionally he signed bank drafts. While Ross had been counsel for the bank and a member of its board of directors for 30 years, he does not

seem to have taken an active part in its management. Wigginton, assistant cashier, had authority to sign bank drafts and cashier's checks. "Either Mr. Reid or the assistant cashier (Wigginton) handled the securities that came to the bank with drafts for collection." As to certain employees of plaintiff bank mentioned in the evidence: Leo Shields was a bookkeeper, and also a messenger to take the bank's outgoing mail to the post office and to receive the bank's incoming mail and deliver the same to the bank. Pearl Simpson appears to have been a general assistant. Reid "had the general management of the affairs of the bank." He had been connected with it for 19 years, first as bookkeeper, and for the five or six years just prior to 1929, as cashier. "There had never been any irregularity or difficulty as to his services. He enjoyed the absolute confidence of the board of directors." "Where securities came to the bank by registered mail with drafts attached for collection Mr. Reid was the one who had charge of the handling of those securities and the collection of the drafts." Shields brought the bank's mail, including registered letters, to the bank, and it was his custom to deliver all of the registered mail to Reid. When remittances were to be made by the bank in payment of drafts that came to it for collection Reid would prepare most of them and would then put the letters containing the remittances in the bank mail box and Shields would take them to the post office. Ross testified that Reid had charge of making the collections of drafts drawn on the customers and of making the remittances in payment of the drafts. In the examination of Ross the following occurred: "Q. Was the purview of the duties of Mr. Reid as cashier of the bank, to buy a bank draft and send it out in payment of a draft drawn on him and sent to the Bank of Taylorsville for collection? A. He had the right to buy drafts in the bank the

same as any other individual, but of course he would pay for the drafts bought by himself. Q. In case he did buy such a draft would it have been considered proper of him within the purview of his duties to send it in payment of a draft drawn on him? A. Yes, sir. Q. If you, Mr. Ross, as director of the bank, and Vice-President and counsel, had been asked at any time in April 1929, whether or not it was proper for Mr. Reid himself to buy a bank draft on the Bank of Taylorsville, and remit it in payment of a draft drawn on him, what would you have said? A. I would have said he would be permitted to do so. Q. There was nothing irregular in Mr. Reid buying a bank draft and sending it out in payment of a draft drawn on him, even though he signed it himself? A. Nothing whatever. . . . Q. Mr. Ross, had you any information before April 24, 1929, of Mr. Reid buying any stock through any brokerage house? A. Yes, I knew Mr. Reid had been buying some stock previous to that but I was under the impression that Mr. Reid was paying for all the stock he was buying, cash. Q. Had Mr. Reid, prior to April 24, 1929, paid for any stock that he was buying by drawing a cashier's check on your bank and without paying for the cashier's check? A. Not to my knowledge. Q. Had Mr. Reid, in April, 1929, any authority of any kind to draw a cashier's check on the Bank of Taylorsville on its funds in the National Bank of Kentucky, to pay for stock without paying for the cashier's check? A. No, sir. . . . Q. As a matter of fact, all the time during these eight years that Mr. Reid was acting as cashier of the Bank of Taylorsville, he had the general management of the affairs of this bank? A. He did. Q. That included the signing of the cashier's checks and bank drafts? A. It did." Mr. Bourne testified as follows: "In April, 1929 he (Reid) had practically charge of the bank. . . . He

had the management of the bank's business. Either
he or the assistant cashier signed each of the bank
drafts of the Bank of Taylorsville. Occasionally I
signed them. Both the cashier and assistant cashier
had authority to sign bank drafts. These were usually
drawn on our correspondent bank in Louisville or our
correspondent in New York. At the time referred to
almost all of the mail of the bank went through Reid's
hands. Sometimes he brought it to the bank, some-
times Mr. Wigginton did, and sometimes one of the
bookkeepers. Either Mr. Reid or the assistant cashier
handled the securities that came to the bank with
drafts for collection. Very often if they were both out
I would handle them. They would carry each of the
transactions of that kind through one of our cor-
respondent banks either at Louisville or New York.''
Mr. Bourne sometimes made purchases of securities,
and in each instance the securities would come to the
bank by registered mail with a draft drawn on him
and he would then issue a bank draft on plaintiff bank,
signed by him as president, for which he would reim-
burse the bank. ''That was the usual procedure.''

Defendants contend that they ''through their agent,
the Continental Illinois Bank and Trust Company,
forwarded the draft drawn by the defendants on Reid,
to the plaintiff Bank of Taylorsville for collection.''
The undisputed facts sustain this contention.

Defendants next contend that ''the draft drawn by
the defendants on Reid and forwarded to the plain-
tiff Bank of Taylorsville for collection was in fact duly
received by that bank in the usual course of its busi-
ness.'' Plaintiff answers that Continental bank
nominated plaintiff bank as an agent to collect, but
that in order to create the relation of principal and
agent it was necessary for plaintiff bank to accept the
agency or to act thereunder; that ''if there was nothing
in the evidence other than the fact that the draft for

collection, together with the oil stock and the letter requesting the collection, was put in an envelope addressed to Bank of Taylorsville and deposited in the mail, then from this alone it might be presumed Bank of Taylorsville as a corporation received that envelope and its contents'' and acted thereunder, but that the evidence shows that Reid was the only one connected with the bank that knew about the transaction. Plaintiff calls attention to evidence, adduced upon the hearing, that shows that Reid had the general management of the affairs of the bank and that he almost always handled the registered mail, and it argues therefrom that defendants, at the time of the transaction, ''might well have known that in a small bank the unfaithful agent, that was particularly interested in the transaction, would be able to hide the transaction completely from his principal.'' We find no evidence that defendants or their agent knew or had any reason to believe that Reid had the general management of the affairs of the bank and would be the sole person connected with the bank who would know about the transaction, or that defendants or their agent had any knowledge as to the manner in which the business of plaintiff bank was conducted, or that ''almost all of the bank's mail went through Reid's hands.'' There is no evidence from which it could be reasonably inferred that when Continental bank sent the letter in question ''addressed in an envelope to the Bank of Taylorsville,'' it knew or should have known that the letter would be received by Reid and the transaction hidden from the other officers of the bank. Continental bank followed the customary procedure in matters of this kind. When Shields received the registered letter at the post office he was acting as the agent of plaintiff bank, and his possession was the possession of the bank. He delivered the letter to Reid, who was the duly authorized officer of plaintiff bank to

receive it. The instant contention of defendants must be sustained.

Defendants contend that "the bank draft of the Bank of Taylorsville received by the Continental Bank in payment of the draft drawn on Reid and sent to the Bank of Taylorsville for collection was returned by the Bank of Taylorsville in due course of business and was the duly authorized remittance of the plaintiff bank." We deem it necessary to refer to the principal cases cited by plaintiff and defendants in connection with the instant contention: *Paine v. Sheridan Trust & Sav. Bank*, 255 Ill. App. 250, decided by this division of the court, and affirmed by the Supreme Court (342 Ill. 342), cited by plaintiff, is, we think, clearly distinguishable from the instant case upon the facts. In our opinion therein we said: "Plaintiffs, copartners as Paine, Webber & Co., were engaged in a stock brokerage business in Chicago and elsewhere. Defendant was a corporation, doing a general banking business in Chicago. During May, 1927, and prior thereto, plaintiffs were acting as brokers for defendant and its customers in the buying and selling of securities. On May 11, 1927, and for several years prior thereto, plaintiffs had in their employ as cashiers in their Chicago office C. E. Carlson and J. J. Collum, who were known by defendant to be such. In December, 1926, Carlson, at the request of Collum, borrowed from defendant $5,500, giving his (Carlson's) note therefor, secured by the deposit with defendant of 600 shares of the preferred stock of the Julian Petroleum Corporation. Carlson borrowed said sum for the accommodation of Collum, and the stock, so deposited as security, was the property of Collum. About the same time Collum, who personally had a checking account with defendant, borrowed a like sum from defendant, pledging as security for his note an additional 600 shares of said stock. From

time to time thereafter Collum made payments on *both* notes to defendant, usually in cash but on one or two occasions by his personal check. On May 10, 1927, there was due to defendant on *each* note a balance of $1,650, and the market value of the collateral thereto had so rapidly declined that defendant determined to call the loans. On that day Joseph H. Hartman, a note teller for defendant, notified Collum (but not Carlson) by telephone that the balance due on *both* notes, $3,300, together with accrued interest of $3.85, must be paid at once. During this telephone conversation Collum said to Hartman that if defendant would deliver the two notes, and the stock deposited as collateral, to the 'cashier's cage' in plaintiffs' Chicago office, he (Collum) would give defendant a check for the amount due on the notes. On the following morning, May 11, Hartman gave to a messenger of defendant the two notes, and the 1,200 shares of said stock, with instructions to deliver them to Collum at plaintiffs' office upon receipt of a check for $3,303.85. Later in the day the messenger returned with the check in question, which defendant accepted and applied the proceeds to the payment of the balance due on the two notes. The check is drawn by plaintiffs, viz., 'Paine, Webber & Co.,' by 'Walter Brunton' and 'C. E. Carlson.' It is dated May 11, 1927, and it directs the drawee, the Standard Trust and Savings Bank of Chicago, to 'pay to the order of Sheridan Trust and Savings Bank' (defendant) the sum of $3,303.85. . . . Neither when defendant accepted the check, nor before it received the proceeds thereof, did it make any inquiry as to Collum's authority to use a check of plaintiffs to pay his personal indebtedness. On May 11, plaintiffs did not owe defendant $3,303.85, but they did owe it the sum of $1,058.97, which sum they paid on the same day by another check, also accepted by defendant. We find no evidence in

the record tending to show that Collum had authority to use plaintiffs' funds to pay his personal indebtedness, or that plaintiffs ever said or did anything which could have led defendant to believe that Collum had any such authority. The evidence discloses that Carlson and Collum each had authority to draft and sign checks in payment of *plaintiffs'* obligations. Such checks, however, were required to be signed also by *either* M. J. O'Brien (a resident copartner of plaintiffs' firm) or Walter Brunton (plaintiffs' office manager.) The evidence further discloses that Collum drafted the check in question, that he entered in the check register a false statement that the check was issued 'in payment of 100 shares of Warner A' stock, that he obtained the signatures of Carlson and Brunton on the check by misrepresentations, and that as cashier he drew many of plaintiffs' checks each day. . . . The check, drawn by plaintiffs, was payable to the order of the bank, to which plaintiffs were not then indebted to the amount of the check. And the check was delivered to the bank by Collum, known by the bank to be an agent and cashier of plaintiffs' with limited authority, in payment of his personal indebtedness to the bank, and was accepted by the bank in discharge thereof.'' In the present case defendants, through their agent, Continental bank, did not deal with Reid and did not receive payment of the draft from him, but sent a draft to plaintiff bank with directions to collect it of Reid, and it thereafter received from plaintiff bank the draft in question; and, furthermore, it is admitted that Reid had not only general authority in the ordinary course of business to draw cashier's checks of plaintiff bank on its funds in the National Bank of Kentucky, but that he also had authority to pay for the stock purchased by him in like manner, provided he reimbursed the plaintiff bank for the cashier's checks.

Plaintiff argues that it is a banking institution and cannot legally, under its charter powers, allow its money to be used in payment of an individual debt, and that even if its directors had authorized the transaction in question such action would have been ultra vires and would not bind plaintiff bank, and in support of this argument cites *St. Charles Sav. Bank v. Orthwein Inv. Co.*, 160 Mo. App. 369, 140 S. W. 921. It is somewhat difficult to reconcile this argument with another raised by it, viz., "The authority and right of Reid to take his principal's draft and money, without paying therefor, must be shown by previous transactions of the same kind; and must have been known by defendant or its agent when taking Reid's cashier's check in question." However, *St. Charles Sav. Bank v. Orthwein Inv. Co., supra,* is readily distinguishable from the instant case upon the facts. It there appears that the defendant was doing a brokerage business in St. Louis, and Mispagel, the cashier of the plaintiff bank, "had a great many transactions with the defendant of a speculative nature, dealing in 'puts and calls,' buying and selling wheat, stocks, etc.," and in each Mispagel issued and *personally delivered to defendant* a draft signed by him as cashier of the plaintiff bank, in favor of the defendant payee, and defendant admitted that it had knowledge that Mispagel was using his authority as cashier to sign bank drafts "on his own account," and the defense it sought to interpose was that "plaintiff was well aware of each transaction, or by mere inspection of its books could have so become, by the exercise of ordinary care, and authorized, sanctioned, and ratified such acts." This was an extreme case, entirely different from the instant one upon the facts, and the Missouri court held that in equity and good conscience *"in view of the special facts of the case,* the defendant was not entitled to retain the money as against the plaintiff."

The court held that the drafts were presumptively void "and the obtention by the defendant of the money on them presumptively illegal," and that "no implied authority in the cashier to issue drafts for his own benefit could arise from the general course of business in the bank . . . nor by their having sanctioned the issuance by him of other drafts than those in question," and the court also uses certain other language in reference to implied authority and ratification that seems to run counter to the weight of authority. In *Goshen Nat. Bank v. State,* 141 N. Y. 379, 36 N. E. 316 (opinion by Peckham, J.), wherein it appears that the cashier had fraudulently drawn a draft in favor of the State for taxes received by such cashier as tax collector *and had personally forwarded the draft,* the court said: "It was also proved on the trial that the cashier had the custody and possession of the blank drafts for the claimant, and that he had the right to sign drafts drawn by the claimant on its corresponding banks, and that he had the right to draw a draft on the corresponding bank of the claimant for himself upon the same terms that he had to draw a draft for a stranger." The court further said (p. 318): "It also appears that he had the right to draw such draft for himself upon the same terms that he would have had in case of a third party, which means, I assume, upon payment to the bank of the amount of the draft. There was an apparent authority to draw the draft. It appeared to have been drawn in the course of the employment of the cashier, and it was an act which was within the scope of his general powers. We do not think that, in the case of a bank draft so drawn, the party receiving it would be charged with the duty of inquiry, or with notice of the fact that the cashier had not paid for the draft, and that he was therefore using the funds of the bank to pay his private debt. He would only be so using them in case he did not pay

for the draft, and its form might be the same even if he had paid for it in full. We think there is nothing unusual or suspicious in this form of making the draft payable directly to the creditor of the cashier, nor any notice that in so doing the bank's funds have been improperly used. Bank or cashier's drafts are used so enormously at the present time in the payment or settlement of debts, and in other commercial transactions, that they have almost acquired the characteristics of money. So long as they are drawn on behalf of a solvent bank, and upon a solvent drawee, and signed by one of the officers usually signing such instruments, they are regarded by the commercial community very much the same as so much cash; and the fact that the draft was drawn by a cashier directly in favor of his own creditor, and sent to that creditor by him, would not naturally give rise even to the suspicion that there was anything irregular, fraudulent, or wrong in the conduct of the cashier. The presumption would be that he had performed his duty, and paid for the draft, and that it, therefore, was his property.'' The court held that the bank could not compel the refunding of the proceeds of the draft if the State had no knowledge of the fraud. This case was later quoted by the same court with apparent approval in *Hathaway v. Delaware County,* 185 N. Y. 368, 78 N. E. 153, 154–5. It will be noted that in the *Goshen* case *the cashier personally forwarded the draft in question to the defendant.* (See also *Martin v. Webb,* 110 U. S. 7; *Pemiscot County Bank v. Central-State Nat. Bank,* 132 Tenn. 152, 177 S. W. 74; *Pemiscot County Bank v. Central-State Nat. Bank,* 135 Tenn. 13, 185 S. W. 702, cited by defendant.) In *Campbell v. Manufacturers' Nat. Bank,* 67 N. J. L. 301, 51 Atl. 497, the court, in passing upon a somewhat similar state of facts to that present in *St. Charles Sav. Bank v. Orthwein Inv. Co., supra,* said (p. 499): ''If a bank gives its cashier

authority to draw drafts for his own account on its funds, or ratifies his acts in known transactions which he openly conducts, honestly or dishonestly, it will not be permitted to say that a similar transaction which he secretly and by concealment conducts does not bind it,'' but the court further held that *as the proof showed that the transaction was known to be an individual one and not with the bank,* the burden was cast upon the claimant to establish that the act of the cashier done for his own individual benefit was authorized or ratified, and that neither authorization nor ratification could arise from an unknown, concealed, fraudulent transaction of a cashier. Plaintiff cites *Merchants' Nat. Bank v. Nichols & Shepard Co.,* 223 Ill. 41, but we are unable to see how that case has any application to the facts of the instant one. There the court held that the fact that a corporation carries on the sale of its products through the medium of agencies distributed over the country is not ground for the assumption that the agents, for making the sales and collecting the proceeds, are clothed with the power to borrow money, and also held that ''a principal may be bound to the extent of the apparent authority which he has conferred upon his agent, but that is because he has held the agent out to the public as possessing the power which the agent exercises.'' Nor do we think that *Wheeler v. Home Savings and State Bank,* 188 Ill. 34, also cited by plaintiff, is applicable to the facts of the instant case. In *Mendel v. Boyd,* 71 Neb. 657, cited by plaintiff, it appears that the cashier of a bank embezzled $18,000 of the funds of the bank. ''A large portion of the funds thus embezzled were lost by the cashier in gambling on the board of trade, through the defendant who conducted a commission house.'' The funds in question *''were received by the defendant from the cashier in the gaming transactions.''* (Italics ours.) It also appeared that the cashier issued the

drafts in question without any authority, and the court held that he was guilty of conversion. In *Home Sav. Bank v. Otterbach*, 135 Iowa 157, 112 N. W. 769, also cited by plaintiff, *the defendant dealt directly with the cashier of the plaintiff bank* and there was no evidence of authority or apparent authority in the cashier to draw the draft in payment of his own debt. It must be noted that in each of the principal cases relied upon by plaintiff bank the defendant dealt directly with its debtor. In the instant case Reid paid for the plaintiff bank draft he used in each of the eight or ten prior transactions, and even if the Continental bank had made inquiry in reference to any of the said transactions, the answer would have been, according to the testimony of the officials of plaintiff bank, that Reid had authority to sign the draft.° The officers and directors of plaintiff bank had absolute confidence in Reid and they placed in his hands the general conduct of the business of the bank, and in our judgment it would be highly inequitable, under the facts of this case, to make the defendants bear the loss sustained by plaintiff bank through the failure of Reid to pay for the draft in question. After giving very careful consideration to the important question involved in the instant contention of defendants, we have reached the conclusion that the contention must be sustained.

When the evidence was concluded in this case, the trial court found the issues for defendants and rendered, what seems to us, a clear and able opinion in support of his finding. But upon a further consideration of the case the court made a finding for plaintiff and based it upon the ground that defendants knew that Reid was speculating, and that a certain letter written by him to an employee of defendants was sufficient to warn the latter that Reid needed money very badly and therefore it was necessary that defendants should show affirmatively that somebody in the bank

other than Reid had actual notice of what Reid was doing with the bank's moneys "as far as this transaction was concerned." The letter referred to by the court is as follows:

"Taylorsville, Ky. Nov. 17, 1928

"Dear Bob:— .

"Just a line about Pacific Western stock try, to get me 25 shares at least please, and would like to have 50—if possible to get it.

"Tell your people I have bought considerable bonds for the bank, and it will be a personal favor to throw something to me that I can make something on for myself, and I do need to make all I can.

"Thanking you for anything you can do for me I am

"Yours truly

"Edw. A. Reid."

In our judgment the evidence does not show that Reid was "gambling in stocks" or "speculating in stocks," as these terms are ordinarily used and understood by laymen and courts. He purchased securities, paid for them and received delivery of the certificates of stock. So far as this record shows he retained all of the stocks that he purchased. *St. Charles Sav. Bank v. Orthwein Inv. Co., supra,* and *Mendel v. Boyd, supra,* are cases involving transactions of a purely speculative or gambling nature. In our judgment, to hold that under the circumstances of this case the Continental bank was bound to make inquiry of plaintiff bank before it had the legal right to accept the draft in question, would place an intolerable burden upon banks. Nor can we agree with the interpretation placed upon Reid's letter by the court. As we read it, it furnishes no reasonable basis for a suspicion that Reid was doing or might do something illegal or improper in the performance of his duties as cashier.

The parties submitted certain findings of fact, and defendants have assigned as error the action of the

trial court in relation to several of the same, and as we find the facts different from the findings of the trial court, we therefore make a finding of facts.

The judgment of the superior court of Cook county is reversed, with a finding of facts, and judgment will be entered in this court for the defendants.

*Reversed with a finding of facts and judgment here.*

KERNER, P. J., and GRIDLEY, J., concur.

On motion of defendants, Charles R. Blyth et al., copartners doing business as Blyth & Co., to modify the judgment order of December 30, 1932, by making additional findings of fact, it is hereby ordered that said motion is allowed and said finding of facts is modified so as to read as follows:

Finding of facts: We find as facts that the defendants, through their agent, forwarded the draft drawn on Reid to the plaintiff Bank of Taylorsville for collection; that said draft was duly received by that bank in the usual course of its business; that the bank draft of the plaintiff bank, sent to the defendants' agent in payment of the draft sent by such agent to the plaintiff bank for collection, was the remittance of the plaintiff bank; that when such remittance was received by the defendants' agent it had no knowledge of any facts which could reasonably constitute notice to it that there was anything irregular or improper in the handling of the transaction by the plaintiff bank or any of its officers or employees; that Reid had the authority, in the usual course of the business of the plaintiff Bank of Taylorsville, to buy bank drafts of the plaintiff the same as any other individual and to sign such drafts as cashier and use them in taking up drafts drawn on him; that during a period of three or four months prior to the transaction involved in this case, Reid had bought securities from the defendants, eight or ten times, and in each of those transactions the payment for the securities was made in the

same manner as in the transaction involved in this case; that the defendants are not justly indebted to the plaintiff in the amount alleged in the declaration nor any part of it.