TENNESSEE FARMERS MUTUAL INSURANCE COMPANY, Plaintiff in Error, v. W. N. HAMMOND, Defendant in Error.—306 S. W. (2d) 13.

Western Section at Jackson. May 23, 1957.

Dissenting Opinion June 26, 1957.

Petition for Certiorari Denied by Supreme Court, October 4, 1957.

64

Heathcock, Elam & Cloys, Union City, and John M. Drane, Newbern, for plaintiff in error.

Miles & Miles, Union City, for defendant in error.

BEJACH, J. This cause involves an appeal in the nature of a writ of error by the Tennessee Farmers Mutual Insurance Company from a judgment against it in the sum of $10,000 plus $1,246.79 interest thereon, making a total of $11,246.79, rendered in the Circuit Court of Obion County, Tennessee in favor of W. N. Hammond. The parties will be styled as in the lower court, plaintiff and defendant, or called by their respective names, W. N Hammond having been plaintiff and Tennessee Farmers Mutual Insurance Company the defendant in the lower court.

The plaintiff was on October 31, 1952, and had been for some time prior thereto, insured by the defendant under the provisions of an automobile liability insurance policy

covering his Chevrolet automobile, which policy limited liability of the insurance company to $10,000 for each person injured and to $20,000 for any one accident. On October 31, 1952, the said automobile, driven by the plaintiff, was involved in an accident at the Lindenwood School in Obion County, Tennessee, where a Hallowe'en party was being held. In that accident, Mrs. Helen Mansfield and Mrs. Eva Mae Mansfield were injured. The injuries to Mrs. Helen Mansfield were extremely severe, her left leg having been crushed between the bumper of the automobile and the concrete steps of the school building, which steps she was ascending at the time the automobile driven by W. N. Hammond ran into her from the rear. Her leg was shattered, and, as a result she was hospitalized for eight months, during which time she had eleven operations performed on her leg, the use of which has been permanently impaired. The medical, nursing, and hospital bills for Mrs. Helen Mansfield, incurred as a result of this injury, amounted to $6,000. Following this accident, W. N. Hammond was sued by Mrs. Helen Mansfield for $50,000, by her husband, Walter W. Mansfield, for $10,000, and by Walter W. Mansfield as administrator of Mrs. Eva Mae Mansfield, his mother, for $20,000. Mrs. Eva Mae Mansfield died subsequent to the accident, but not as a result of same. These suits resulted in judgments in the Circuit Court in favor of Mrs. Helen Mansfield for $17,000, in favor of Walter W. Mansfield for $3,000, and in favor of Walter W. Mansfield as administrator of Mrs. Eva Mae Mansfield for $500, said judgments having been rendered March 3, 1954. Appeals from the judgments in favor of Mrs. Helen Mansfield and Walter W. Mansfield were prayed and perfected by W. N. Hammond. The de-

fendant, Walter W. Mansfield, appealed from the judgment in his favor for $3,000, claiming that it was inadequate, and, as administrator, from the judgment for $500, on the same ground. All three judgments were affirmed by the Court of Appeals, and certiorari was denied by the Supreme Court. See Hammond v. Mansfield, 41 Tenn. App. 515, 296 S. W. (2d) 652. The Tennessee Farmers Mutual Insurance Company paid the judgment of $500 in favor of the administrator of Mrs. Eva Mae Mansfield and paid $10,000 of the total amount of the two judgments amounting to $20,000 rendered against W. N. Hammond in favor of Mrs. Helen Mansfield and Walter W. Mansfield. Thereafter, on October 10, 1955, W. N. Hammond brought suit against the Tennessee Farmers Mutual Insurance Co., seeking a recovery from it of $10,000, representing that part of the judgments against him which the insurance company has not paid, together with interest thereon. The basis of this suit, which is the case at bar, is the claim by W. N. Hammond that the defendant, Tennessee Farmers Mutual Insurance Co., had an opportunity to settle the claims of Mrs. Helen Mansfield and Walter W. Mansfield, her husband, within the policy limit of $10,000, but had arbitrarily and in bad faith refused to make this settlement, although there was no fair and reasonable prospect of escaping liability or holding the recovery within the policy limits. The defendant filed pleas in which it denies bad faith on its part, denies that it had an opportunity to settle the claims of Helen Mansfield and Walter W. Mansfield within the policy limits, and avers that its only opportunity to settle was a lump sum settlement of all three cases, including that of Mrs. Eva Mae Mansfield's administrator, along with those of Walter W. and

Helen Mansfield. Defendant's pleas deny the extent of the injuries to Mrs. Helen Mansfield as alleged, deny that it failed to keep plaintiff advised as to the negotiations of settlement, deny that it consciously risked loss to plaintiff in an attempt to protect its rights, deny that it placed the rights of defendant ahead of the plaintiff's rights, and aver that it acted honestly and with due consideration of the best interest of the plaintiff and of its obligations to him.

The cause was tried before the Circuit judge and a jury with the result that a verdict was returned in favor of the plaintiff, W. N. Hammond, and against the Tennessee Farmers Mutual Insurance Co., in the sum of $10,000, with interest thereon from March 3, 1954. After a motion for a new trial had been overruled, the defendant filed an appeal in the nature of a writ of error, which appeal has been perfected.

The defendant, Tennessee Farmers Mutual Insurance Co., as appellant in this court, has filed fifteen assignments of error. It will not be necessary to discuss each of these fifteen assignments of error separately. Able counsel for defendant did not do so, either in their briefs, or in their arguments before this court, and following their example, we will discuss them separately only so far as may be necessary to dispose of the essential merits of the appeal.

Assignment of Error Number I complains of the failure of the trial judge to grant the defendant's motion for a directed verdict, and therefore raises the question of whether there is any material evidence in the record to sustain the jury's verdict. This assignment is, in our opinion, determinative of the lawsuit.

Assignments Numbers II, XI, XII, and XIII complain of the trial judge's action in overruling defendant's objections to testimony offered on behalf of plaintiff. Assignments Numbers III, IV, V, VI, VII, VIII, IX, and X complain of the trial judge's having refused to give instructions to the jury contained in special requests tendered by defendant. Assignment Number XIV complains of the trial judge's having overruled defendant's objection to part of the argument made by plaintiff's attorney. Assignment Number XV is based on the claim that the trial judge failed to exercise a trial judge's function as the thirteenth juror.

In our opinion, as stated above, the first assignment of error presents the controlling issue in this lawsuit. Before passing upon it, we will, therefore, dispose of the other assignments and then discuss, at some length, the issues presented by it.

We have given due weight to the objections made by the defendant to the testimony admitted in favor of the plaintiff over the objection of defendant, and have given careful consideration to the argument of counsel on all of the assignments of error with reference thereto, and have reached the conclusion that all of defendant's objections are without merit. The testimony offered and admitted by the trial judge with reference to the extent of the injuries sustained by Mrs. Helen Mansfield in the accident of October 31, 1952 did not amount, in our opinion, to a retrial of the damage suit growing out of that accident. On the contrary, we think such testimony was properly admissible for the purpose of enabling the trial jury in the instant case to intelligently pass on the issue presented of whether or

not there had been a reasonable probability of holding the verdict in the damage suit case within the policy limits. Likewise, the testimony of plaintiff as to his insistence on settlement of the case, and the cross examination by plaintiff's attorney of defendant's claim agent, Keith Rogers, tended to throw light on the issue of defendant's bona fides or lack of it in failing or refusing to settle within the policy limits. In any event, after an examination of the entire record of the cause, it does not affirmatively appear that the rulings of the trial judge, even if erroneous, affected the results of the trial. Accordingly, in compliance with the provisions of section 27-117, Tenn. Code Ann., Assignments of Error II, XI, XII, and XIII are overruled.

■ With reference to the trial judge's refusal to give in charge to the jury the special requests presented by defendant, we think that, either the general charge of the judge sufficiently and adequately covered the subject matter of these instructions, that, as worded, they were properly refused, or that it does not affirmatively appear that the refusal of these requests affected the results of the trial, as required by Section 27-117, Tenn. Code Ann. Assignments of Error III, IV, V, VI, VII, VIII, IX, and X are accordingly overruled.

■ Assignment of Error XIV complains of the trial judge's having overruled defendant's objection to the argument to the jury made by plaintiff's attorney, that the fact that Walter Wayne Mansfield was a man of no property may have influenced the refusal or failure of the insurance company to settle the damage suit claims. This argument, in our opinion, did not go outside the record, because that conclusion might fairly have been

drawn from Mr. Walter Wayne Mansfield's testimony. Likewise, as with reference to the assignments of error hereinabove disposed of, the provisions of Section 27-117, Tenn. Code Ann., would, in any event, preclude a reversal. Same is accordingly overruled.

■ Assignment of Error XV complains that the trial judge in overruling the motion for a new trial in this cause declined to exercise his function as the thirteenth juror, and contends that the record affirmatively shows that he did so refuse to exercise his function in that capacity. The exact language used by the trial judge when he overruled defendant's motion for a new trial, which is relied upon by defendant's counsel as establishing their contention that he refused to exercise his function as a thirteenth juror, is in the record and is, as follows:

"I heard the evidence in the former case and also the evidence in this case and I have come to the conclusion as, after considering this motion for quite a long while—the fact is this motion, though I just heard it this morning, but knowing that necessarily ought likely to be in the motion I thought of it at various times and I come to the conclusion that this matter should be determined by the appellate courts, I appreciate the fact that what a judge says in passing on these motions is considered by the Appellate Court but I only have one remark to make for whatever it may be considered or not considered, I think this case should be determined by them in this record but I will make this one affirmative statement that Mr. Heathcock, in my opinion, was in no way dishonest and I do not think this record dis-

closes that. So, the motion will be overruled that the Appellate Court may be able to determine this matter."

We find nothing in this language to indicate that the learned trial judge either failed or refused to exercise his function as a thirteenth juror. The circumstance that he saw fit to express his views with reference to one aspect of the evidence in the cause does not indicate that he had failed to carefully consider and adequately weight all of the evidence pertaining to all of the issues in the cause. In the case of McLaughlin v. Broyles, 36 Tenn. App. 391, 255 S. W. (2d) 1020, 1023, the cause was reversed because the record affirmatively disclosed that the trial judge had failed to weigh the evidence and exercise his function as a thirteenth juror; but the language of this decision expressly authorizes a trial judge to overrule a motion for new trial without comment, in which case, it is said that the presumption will be that he did weigh the evidence and exercise his function as the thirteenth juror. To the same effect, see Gordon's Transports, Inc. v. Bailey, 41 Tenn. App. 365, 294 S. W. (2d) 313, 320-321. In the instant case, the affirmative expression by the judge on one aspect of it, does not, in our opinion, destroy this presumption with reference to other aspects of the case. Assignment of Error XV is accordingly overruled.

■ We will now take up Assignment of Error Number I, which we think is determinative of this cause. This assignment is:

"The court erred in overruling and disallowing the defendant's motion for a directed verdict at the close of all the testimony in the case as follows:

'The defendant in this case moves the court to direct the jury to return a verdict in its favor in this case because there is no evidence introduced in the case to support a verdict'."

Disposition of this Assignment of Error, of course, requires us to review the evidence preserved in the bill of exceptions. In doing this, however, we may ignore the testimony of defendant's witnesses, except to the extent that same tended to support the plaintiff's theory of the case. Lackey v. Metropolitan Life Ins. Co., 30 Tenn. App. 390, 397-398, 206 S. W. (2d) 806; Osborn v. City of Nashville, 182 Tenn. 197, 185 S. W. (2d) 510; Coatney v. Southwest Tenn. Elec. Membership Corp., 40 Tenn. App. 541, 292 S. W. (2d) 420.

It was the theory of defendant in this cause that the defendant did not have an opportunity to settle the claims of Mrs. Helen Mansfield and of Walter Wayne Mansfield within the limits of the policy because their claims were tied in with that of the administrator of Mrs. Eva Mae Mansfield, that they handled the claims with due care and consideration for the rights of W. N. Hammond, the insured, and that, in any event, they acted with complete good faith and fairness. There was ample proof to have sustained a verdict of the jury to that effect, but, unfortunately for the defendant, the jury's verdict went the other way.

Reviewing the evidence then, from the standpoint of plaintiff's contentions, we find that there was ample evidence, including a letter from the attorney of the plaintiffs in the damage suit case, to warrant a finding of fact by the jury in the instant case, that the claims of Mrs. Helen Mansfield and Walter Wayne Mansfield, her

husband, could have been settled within the policy limits of $10,000 and without having such settlement conditioned on settlement of the claim of Mrs. Eva Mae Mansfield's administrator. Counsel for defendant, in the instant case who represented W. N. Hammond as defendant in the damage suit case, as, of course, they had a right to do under the provisions of the insurance policy, contended in the damage suit case that the accident was an unavoidable one because Hammond's brakes had suddenly and unexpectedly failed to function. There was evidence, however, both in the trial of the damage suit case and in the trial of the instant case that it was not possible for the brakes to suddenly fail, and with no work having been done on them in the meantime, as was shown to have been the case, to be again in good working condition two days later, as was testified by one of plaintiff's witnesses. In any event, there was ample evidence in the damage suit case, to sustain the jury's verdict in that case, even if it be assumed that the brakes did suddenly and unexpectedly fail to work. On that theory, this Court affirmed the verdicts of Mrs. Helen Mansfield and of Walter W. Mansfield. See Hammonds v. Mansfield, Tenn. App., 296 S. W. (2d) 652. One example of this character of evidence is the testimony of W. N. Hammond, himself, given at both trials,—that he might have avoided the accident by steering his automobile into other parked cars. In the instant case, he testified that in making his original statement to Messrs. Heathcock and Elam who, as attorneys for the Tenn. Farmers Mutual Ins. Co., represented him in the damage suit case, that he made this observation but was told by Mr. Tom Elam not to let him hear him say that again.

In view of the fact that Mrs. Helen Mansfield was struck from the rear by Hammond's automobile, which pinned her leg between the bumper of the car and the concrete steps, it is hardly possible that she could have been found guilty of contributory negligence; and, in view of the extent of Mrs. Mansfield's injuries, and in light of the extremely large amount of her medical expenses, the jury in the instant case was certainly warranted in finding that there was no reasonable probability in the damage suit case, either of successfully defending same or of holding a verdict within the $10,000 limit of the policy.

But, it is contended on behalf of defendant in the instant case that the defendant was entitled to have had its motion for a directed verdict granted, because there was no evidence from which the jury could have found that either the defendant insurance company or its attorneys were guilty of bad faith, or lack of good faith, in electing to try the damage suit case rather than settle same within the limits of the insurance policy. They rely on the cases of Aycock Hosiery Mills v. Maryland Casualty Co., 157 Tenn. 559, 11 S. W. (2d) 889, and Southern Fire and Casualty Co. v. Norris, 35 Tenn. App. 657, 250 S. W. (2d) 785, as authorities for this contention. These cases are also relied on by counsel for the plaintiff.

The case of Aycock Hosiery Mills v. Maryland Cas. Co., was one in which a recovery for the excess judgment was sustained by the Supreme Court. In this case, the Hosiery Mills had insured its risks under the Workmen's Compensation Act by a policy of the Maryland Cas. Co. One of the Hosiery Mill's employees was injured, whereupon the Casualty Company refused to pay compen-

sation to him, on the ground that his injuries did not "arise out of and in the course of his employment." [157 Tenn. 559, 11 S. W. (2d) 890] When suit was filed, the Casualty Company, as under its policy it had a right to do, assumed the defense. At the trial of this suit, brought under the Workmen's Compensation law, the father of the employee testified that his son had been employed in violation of the Child Labor Law, without an employment certificate. The Casualty Company undertook then to amend its pleas so as to rely on the illegality of the employment, which defense, if successful, would have absolved the Casualty Company but would have cast the employer in a common law action. This defense was later abandoned; but, after some delays, a continuance by agreement or acquiescence of the Casualty Company, and the reinstatement of the cause as for a new trial, the employee took a nonsuit and brought suit against the Hosiery Mills in a common law action. The Casualty Company could have settled the Workmen's Compensation action and the employer had insisted that it do so, but the Casualty Company had refused. Prior to the trial of the common law action, the court house at Jasper, Tennessee had burned, and the Hosiery Mills was unable to prove the legality of the employment, which it claims it could have done while the Workmen's Compensation suit was pending. The Hosiery Mills was cast in the common law action, whereupon it brought suit against the Maryland Casualty Company for the amount of the judgment which it had been required to pay. Its recovery of this amount in the lower court was affirmed by the Supreme Court. From the opinion of the Supreme Court written by Cook, J., we quote:

"Facts presented by the record make a clear case of liability. The contract of insurance created a relation out of which grew the duty of the casualty company to exercise, not only good faith, but ordinary care. It assumed the defense of the suit brought by the employee under the Compensation Act to the exclusion of the defendant. Instead of disclaiming liability and retiring from the case, when it learned of the controversy over the issuance of an employment certificate, it exhibited bad faith in its effort to protect itself at the hazard of its indemnitee by setting up the defense that the emloyment was illegal. When, after protest from the insured, that defense was abandoned, the casualty company refused to adjust the claim, and, according to the testimony of Aycock and Carter, prevented the hosiery mills from adjusting it. The casualty company was given an opportunity to abandon the contest and let the employer bring the compensation case to a final judgment determinative of its liability. Moreover, there was negligent failure to bring about the entry of a final judgment after the trial judge found the case of liability under the Compensation Act; and, after dallying with the claimant over the measure of compensation for a year, the casualty company negligently agreed to restore the case to the docket as upon a new trial.

"An insurer assuming under its policy to control litigation against the insured must act in good faith and with reasonable diligence and caution. Douglas v. United States Fidelity & Guaranty Co., 81 N. H. 371, 127 A. 708, 37 A. L. R. 1477. That obligation attended the contract, and liability for breach of the

obligation arises out of the injurious conduct of the insurer who assumed to act under the contract. 34 A. L. R., Note p. 738, and cases cited; Anderson v. Southern Surety Co., 107 Kan. 375, 191 P. 583, 21 A. L. R. 761; Attleboro Mfg. Co. v. Frankfort Marine Accident & Plate Glass Ins. Co., [1 Cir.] 171 F. 495." Aycock Hosiery Mills v. Maryland Casualty Co., 157 Tenn. 559, 568-569, 11 S. W. (2d) 889, 892.

In the case of Southern Fire & Casualty Co. v. Norris, 35 Tenn. App. 657, 250 S. W. (2d) 785, 787, the insured, under a garage liability policy, had recovered a judgment against the insurance company for the excess over the policy limit which had been recovered in a damage suit against him. The trial court had instructed the jury that no verdict could be rendered solely on a showing of negligence in the investigation of the claim and in negotiating, attempting to negotiate, or failure to negotiate a compromise of the claim, though such negligence, if shown, could be considered in determining the existence of bad faith. That term, the Court defined as conveying the "idea of willingness to gamble with the insured's money in an attempt to save its own money", or, "as an intentional disregard of the financial interests of the plaintiff in the hope of escaping the full liability imposed upon it by its policy." The Court of Appeals, Eastern Section, held that the questions of bad faith and proximate cause were for the jury. From the opinion of that Court, written by McAmis, J., we quote:

"It is clearly shown that when defendant declined to accept the offer to settle for $9,500, or to pursue the offer to recommend such a settlement if it so

understood the offer, it had before it evidence that Davis would be able to show on the trial a condition of total and permanent disability and that a great preponderance of the evidence would show a case of liability. In view of these circumstances and the counter offer of only $7,500 it was within the province of the jury to decide whether the $9,500 was rejected and whether good faith required defendant to make known to Davis' counsel its willingness to pay the policy limit in the hope of saving its insured from having to pay a much larger verdict, especially in view of Davis' offer to settle only a few days earlier for $500 less than the policy limit.

"The jury, as to the triers of the facts, may have concluded that defendant had become resigned to the probability of having to pay $10,000 and was indifferent to the effect of its failure to compromise upon its insured. We cannot say under all the evidence and the inferences most favorable to plaintiff that there is no reasonable basis for such conclusion. Defendant had neglected to learn Davis' true condition until a trial was imminent and had failed to learn of the existence of a most material witness. It had declined to accept an offer of compromise within the limits of the policy liability and, failing to advise plaintiff of the offer, had authorized a counter offer of such an amount that Davis apparently considered it a rejection of his own offer which he promptly increased to $12,000. Although then fully aware of the seriousness of its insured's position both on the issue of liability and the probable amount of the recovery and although willing to pay $10,000, it made no further effort to compromise and proceeded

to trial suggesting that plaintiff pay $2,000 and settle on the basis of Davis' last offer.

"We recognize the full weight of defendant's insistence that hindsights are always better than foresights and that counsel placed in such a plight are not required to have the gift of prophecy. We are aware also of the delicacy of the relationship between insurer and insured in cases of this kind. The insurer is under no duty to compromise a claim for the sole benefit of its insured if to continue the fight offers a fair and reasonable prospect of escaping liability under its policy or of getting off for less than the policy limit. The insured surrenders to the insurer the right to investigate and compromise or contest claims knowing that, in event of a claim, the insurer will have its own interests to consider. But an insured also has a right to assume that his interests will not be abandoned merely because the insurer faces the prospect of a full loss under the policy. The relation is one of trust calling for reciprocity of action. The insured owes the duty of full co-operation—the insurer the duty of exercising good faith and diligence in protecting the interest of its insured.

\* \* \* \* \* \*

"The cases covered in the notes, supra, establish the prevailing rule that the right to control investigation, settlement and litigation of claims must be subordinated to the insurer's contractual duty to indemnify the insured against loss; that the insurer cannot escape liability by considering only what appears to be for its own interest. It must consider

also the impact of its decision upon its insured and deal fairly and in good faith. This duty arises not so much under the terms of the contract but is said to arise because of the contract and to flow from it." Southern Fire and Casualty Company v. Norris, 35 Tenn. App. 657, 667-668, 250 S. W. (2d) 785, 789.

In the case of Vanderbilt University v. Hartford Accident & Indemnity Co., 6 Cir., 109 F. Supp. 565, where an offer to settle for the limit of the policy had been made with no reply given, even though the insurer had just before the trial offered to settle for its policy limit, which offer was then rejected, the insurance company was held liable for the excess of the verdict over the policy limit on the ground that the action of the insurer amounted to bad faith and intentional and wanton disregard of and indifference to the interest of the insured. See also Vanderbilt Law Review, Volume 6, Number 5, page 1071.

Applying the principles announced in the above cited authorities to the facts of the case at bar, we think the evidence in this record is amply sufficient to have justified the jury in finding as a fact that the Tennessee Farmers Mutual Insurance Company subordinated the rights of its insured to its own interests, and that this amounted to lack of good faith on the part of the insurance company. Mr. J. Paul White, who had represented the Mansfields in the damage suit case, testified in the instant case that when he made an offer to Mr. Heathcock, one of the attorneys for W. N. Hammond in the damage suit case, who is also general counsel for the defendant, Tennessee Farmers Mutual Insurance Co., within the limits of the policy, that Mr. Heathcock said,

"There is no reason for us to settle this case with you, you are demanding the policy limits; we have nothing to lose by trying it"; and that on another occasion when he said to Mr. Heathcock, "Why don't you settle these cases?" Mr. Heathcock replied, "We can't lose; you are asking all the coverage."

There is another circumstance, clearly established in this record, which, in our opinion, conclusively establishes that the attorneys for defendant insurance company were concerned with the interests of that company to the exclusion of the interests of the insured, W. N. Hammond. This occurred after the verdict and after said attorneys had made a motion for a new trial in the damage suit case on behalf of W. N. Hammond, but it was a circumstance that clearly warranted the jury in the instant case in finding as a fact that the attorneys for the Tenn. Farmers Mutual Ins. Co., who were also attorneys for W. N. Hammond in the damage suits, had subordinated the rights of the insured to those of the Insurance Company. The motion for a new trial had been argued before the trial judge, and apparently the only ground in the motion for a new trial, about which the judge seemed to be in doubt, was the charge of misconduct on the part of the jury with reference to considering the question of insurance in connection with arriving at the verdicts. In that situation, Messrs. Heathcock and Elam as attorneys for the Tenn. Farmers Mutual Insurance Co., prepared and procured the signature of W. N. Hammond to a letter addressed to the Tenn. Farmers Mutual Insurance Co., which is as follows:

"Union City, Tennessee

"May 8, 1954

"Tennessee Farmers Mutual Insurance Company

"Columbia, Tennessee

"Re: Policy No. 14400

"Claim No. 13156

"Assured: W. N. Hammond

"During the latter part of the January Term of the Circuit Court of Obion County, Tennessee, judgments were entered in the three cases pending against me growing out of my automobile accident at the Lindenwood School in favor of the plaintiffs in the following amounts:

"Helen Mansfield _____$17,000.00
"Walter Wayne Mansfield _____ 3,000.00
"Walter Wayne Mansfield, Administrator of
    Eva May Mansfield _____ 500.00

"I understand that Paul White, attorney for plaintiffs, has filed motions for new trial in the cases of Walter Wayne Mansfield and Walter Wayne Mansfield, administrator, on the ground of the inadequacy of the verdicts.

"I understand that Heathcock & Elam, representing your interests and mine in the suits, have filed motions for new trial in the Helen Mansfield and the Walter Wayne Mansfield cases, assigning numerous errors including the ground of misconduct on the part of the jury when it discussed and considered what they understood to be the policy limits in arriving at their verdicts in the cases.

"I understand that all of those motions were argued before the Court on May 3, at which time the Court indicated a disposition to overrule all of the motions except that he was concerned about the charge of misconduct on the part of the jury. He indicated that the members of the jury should be summoned and examined in regard to their discussion of the policy limits during their deliberations. Originally it was suggested that the members of the jury be summoned for May 15, 1954.

"I understand that there is a distinct possibility that if Heathcock & Elam would strike from their motions in the Helen Mansfield and Walter Wayne Mansfield cases the charge of misconduct on the part of the jury, the Court would overrule all motions for a new trial and leave the parties to appeal on the other questions raised by the motions.

"I am firmly of the opinion that neither the company nor I would be benefited by a new trial, as another jury would most likely find against me in the cases for amounts equal to or in excess of the amounts of the present judgments.

"I understand that if the motions for new trial are overruled an appeal could be prayed by either party from the judgments in the cases in which the motions were filed, in which appeals the legal questions involved could be passed on by the Appellate Courts.

"This letter will authorize you and Heathcock & Elam to move to strike the ground of misconduct on the part of the jury from the motions for new trial in the Helen Mansfield and Walter Wayne Mansfield cases, provided that in the same order the Court

will overrule all motions for new trial including those filed by Walter Wayne Mansfield and Walter Wayne Mansfield, administrator.

"Heathcock & Elam have explained the entire situation to me. I understand the situation and believe that the move hereinabove outlined would be to our mutual interests.

"Yours very truly."

This letter is obviously in the interest of the insurance company, rather than that of the insured. It surrendered what apparently was the best chance of W. N. Hammond, as defendant in the damage suit case, and of the insurance company representing him, to obtain a new trial. W. N. Hammond, as plaintiff in the instant case, testified that he did not at the time of signing this letter, nor at the time of testifying in the instant case, fully understand what he had signed. A copy of the letter which he had signed was not left with Hammond at the time he signed same; but after he had consulted Mr. W. M. Miles, one of his attorneys in the present law suit, a copy of same was given to him. Thereupon, Mr. Miles, representing W. N. Hammond, confronted Mr. Heathcock with this letter and told him he thought he had had Mr. Hammond sign a letter which was contrary to his interest. So far as the insurance company is concerned, in giving up what may have been its best chance for obtaining a new trial, it certainly eliminated any danger of a larger verdict at a second trial in the case of Walter W. Mansfield as administrator of Mrs. Eva Mae Mansfield, and thereby eliminated, potentially, additional loss up to $9,500, which would still have been within the limits of its policy. The clause in the letter,

"provided that in the same order the Court will over-rule all motions for new trial including those filed by Walter Wayne Mansfield and Walter Wayne Mansfield, administrator", clearly indicates that this benefit to the insurance company was one of the motivating reasons for procuring the letter and for abandoning the charge of misconduct of the jury as one of the grounds for a new trial. In that situation, the insurance company was certainly gambling with the insured's money, or liability, in an attempt to save its own. It is apparent to us, also, that in that situation, where Messrs. Heathcock and Elam were acting in the dual capacity of attorneys for the insurance company and for W. N. Hammond, they gave priority to the interests of the insurance company, rather than to those of Mr. Hammond. This situation, therefore, falls within the spirit if not the letter of language used by Judge Caruthers in the case of Tisdale v. Tisdale, 34 Tenn. 596, 608, 64 Am. Dec. 775, part of which is quoted with approval by Mr. Justice Samuel Cole Williams in Pemiscot County Bank v. Central State National Bank, 132 Tenn. 152, 158, 177 S. W. 74, and which is as follows:

"It is one of the canons of a court of equity that one who undertakes to act for others cannot in the same matter act for himself. Where confidence is reposed, duties and obligations arise which equity will enforce. A trustee cannot throw off the trust at pleasure, to the injury of the cestui que trust. He will not be allowed to mix up his own interests and affairs with those of the beneficiary. This doctrine has its foundation not so much in the commission of actual fraud, but in that profound knowledge of the human heart, which dictated that hallowed

petition, 'Lead us not into temptation, but deliver us from evil', and that caused the announcement of the infallible truth, that 'a man cannot serve two masters'.''

In overruling the motion for new trial in the instant case, the learned trial judge said, "Mr. Heathcock, in my opinion, was in no way dishonest and I do not think this record discloses that." Mr. Heathcock's honesty was not in issue in this lawsuit, but his error of judgment in undertaking to represent two conflicting interests, and in preferring one of these over the other, was, in our opinion, sufficient justification for the jury's having returned its verdict in the instant case against the insurance company, whose interests were thus preferred.

The rule of good faith established in Tennessee by the decisions in Aycock Hosiery Mills v. Maryland Casualty Company, 157 Tenn. 559, 11 S. W. (2d) 889, and Southern Fire and Casualty Co. v. Norris, 35 Tenn. App. 657, 658, 250 S. W. (2d) 785, is substantially analogous to and controlled by the same principle as that provided for in Sec. 56-1105, Tenn. Code Ann. which imposes a 25% penalty on insurance companies failing or refusing to pay claims within sixty days where, "it shall be made to appear to the court or jury trying the case that the refusal to pay said loss was not in good faith." Construing this provision, originally enacted by chapter 141, Acts of 1901, in Silliman v. International Life Insurance Co., 135 Tenn. 646, 188 S. W. 273, the Supreme Court held that a life insurance company was not liable for this penalty where it had refused payment and had in good faith defended a suit brought for the proceeds of a life insurance policy on the ground that

the suicide clause in the policy constituted a valid defense, even though the Supreme Court had held that a clause in this particular policy made it incontestable after one year, and that the suicide relied on had occurred after one year, in view of the fact that, after this decision, the insurance company tendered the full amount of the policy. In the case of Daugherty v. Stuyvesant Insurance Co., 169 Tenn. 300, 86 S. W. (2d) 1095, the Supreme Court held, however, that the imposition of this penalty had been properly allowed by the trial court and added to the recovery on a fire insurance policy, where the only defense had been the contention that the transfer of notes secured by the property which had burned operated as a transfer of title to the property in violation of a provision of the policy, which defense was held to be wholly without merit.

Evidently able counsel for defendant in the instant case must have thought that there was considerable doubt about the issues involved in the instant case, because they undertook to forestall this litigation by trying to obtain a declaration of their rights and liabilities in a suit filed in the Chancery Court of Obion County under provisions of the Declaratory Judgment Law of this State. In that suit the learned Chancellor refused to entertain the suit, because of disputed issues of fact which were determinative of the rights of the parties. This ruling of the Chancellor was affirmed by the Supreme Court in the case of Tennessee Farmers Mutual Insurance Co. v. Hammond, 200 Tenn. 106, 290 S. W. (2d) 860. The parties in that case were the same as the parties in the instant case. The disputed issues of fact which caused the Chancellor, in that case, to refuse a declaratory judgment, have, in the instant case, been resolved

by the jury's verdict against the defendant, Tennessee Farmers Mutual Insurance Company.

For the reasons hereinabove stated, we think there was ample evidence to have warranted the submission of these issues to the jury in the instant case, and that Assignment of Error Number I, along with all of the other assignments of error hereinabove disposed of, must be overruled. The result is that the judgment of the Circuit Court of Obion County will be affirmed, and judgment will be entered in this Court in favor of plaintiff, W. N. Hammond and against the defendant, Tennessee Farmers Mutual Insurance Company, for $11,246.79, the amount of the judgment entered in the Circuit Court of Obion County, Tennessee on June 13, 1956, together with interest thereon at the rate of 6% per annum from August 18, 1956, the date on which the motion for a new trial was overruled.

The costs of the appeal, together with the costs of the lower court, will be adjudged against the defendant, Tennessee Farmers Mutual Insurance Company and the sureties on its appeal bond.

Avery, P. J. (Western Section), dissents.

Carney, J., concurs.

Avery, Presiding Judge (W. S.) (dissenting).

In dissenting from the majority Opinion, I am unable to agree that there was any evidence from which bad faith could be inferred justifying the submission of such issue to the jury:

(1) It was not bad faith on the part of counsel for defendant in the original damage suit to rely upon what

defendant said to them about how the accident occurred and their investigation which this record shows they made in order to determine whether to accept the face value of the statement made by the defendant Hammond, relative to a sudden failure of his brakes.

(2) It was not bad faith nor any evidence of bad faith, for counsel, after the verdict had been rendered and judgment pronounced thereon in the original damage suit wherein Walter Wayne Mansfield as Administrator of his deceased mother, had been awarded $500, his wife had been awarded $17,000, and he had been awarded $3,000, and while Mansfield as Administrator and upon his own claim for damages with respect to the injuries to his wife, medical expenses, etc. had a motion for a new trial pending at the same time that Hammond had a motion for a new trial pending, to explain to Hammond the whole legal and factual situation, as they saw it, after hearing all the proof and after such full explanation, framing the letter which Hammond signed.

(3) It was not bad faith nor any evidence of bad faith on the part of counsel or representative of the insurer to fail to discover the testimony later given by the Reed child, to the effect that after Hammond turned into the school grounds, he increased the speed of his car.

(4) It was not bad faith nor any evidence of bad faith on the part of counsel to file the Chancery suit under the Declaratory Judgment Act referred to in the majority Opinion. The Court so held that it was not competent to show bad faith.

(5) It was not bad faith nor any evidence of bad faith on the part of counsel, when Hammond had said to Heathcock and Elam that he could have "probably"

avoided the accident by continuing on around the school-yard drive, and when Mr. Elam said to him in substance that he did not want to hear him say that any more.

(6) In my opinion, the Trial Judge was not satisfied with the verdict of the jury nor did he agree to it as a 13th juror.

Looking generally at item (1) above, in the majority Opinion this statement is made:

"In doing this, however, we may ignore the testimony of defendant's witnesses, except to the extent that same tended to support the plaintiff's theory of the case."

In my opinion, that is not the rule that governs our examination of the record on appeal in this case. If there is material testimony of a reputable defendant undisputed, uncontradicted, or given by a reputable witness for either party, it is not countervailing evidence, but stands as a truth; and unless such evidence is contradicted by some evidence or circumstances from which a reasonable inference otherwise can be drawn, we have no right to exclude it. We consider all the evidence and only disregard countervailing evidence. In my opinion, there is no such evidence in this case.

I do not agree with the statement in the majority opinion:

"It was the theory of defendant in this cause that the defendant did not have an opportunity to settle the claims of Mrs. Helen Mansfield and of Walter Wayne Mansfield within the limits of the policy because their claims were tied in with that of the administrator of Mrs. Eva Mae Mansfield."

I find no such argument in the record from which such a conclusion could be drawn. On the contrary, there appears all through the record by the admission of Mr. White, counsel for the Mansfields, that Mr. Heathcock said to him many times: ''You may break the proposed settlement down any way you want to''. In the statement of the case by learned counsel for defendant, the Hon. John M. Drane, who presented the principal argument in this Court for the defendant, beginning on p. 11, he says:

> ''We make no claim that there was not some proof in this record that the defendant had an opportunity, although not a clear opportunity, to settle Mrs. Mansfield's claim and her husband's for her injuries within the policy limits, but we urge however upon the Court that this is as far as the proof in the case goes and that there was no proof from which it could be reasonably inferred that defendant acted in bad faith even though there was an opportunity to settle within the policy limits.''

In my opinion, the only theory upon which the defendant rested his case is properly stated in the majority opinion, where it is said that it was the theory of defendant that—

> ''* * * they handled the claims with due care and consideration for the rights of W. N. Hammond, the insured, and that, in any event, they acted with complete good faith and fairness.''

Mr. White was asked if he had personal conversations with Mr. Heathcock. He answered:

"Yes, I did. Mr. Heathcock and I had several casual conversations relative to it both on the street and on the phone." (R. 147)

\* \* \* \* \* \*

"And we discussed it pro and con—the possibility of his defense and the injury and general details about the whole matter over a period of—I can't actually pinpoint how many times, but several conversations." (R. 147)

He discussed the amount on more than one occasion, and after he was employed, he was told by Mr. Heathcock that he would pay $9,000 for injuries in all three cases and he said that Heathcock said:

"\* \* \* you can break it down any way you want to but you might consider \* \* \*"

and again:

"\* \* \* $6,750.00 and $2,250.00; that is $6750.00 for the two cases; that is Walter Wayne Mansfield for expenses and loss of services and for the injuries— pain and suffering—of Helen Mansfield; $6750.00 and $2250.00 on the Walter Wayne Mansfield, administrator, case." (R. 152)

He told Mr. Heathcock that he would settle Mrs. Mansfield's case and her husband's case for $9,750 on the day of the trial, after the first day's hearing when his witnesses had been on the stand, he wrote Naul Hammond a letter and sent a copy of it to Mr. Heathcock, offering to settle the two cases for $9,999 and the Administrator's case for $5,000. He stated that he did not tie them together. Copy of that letter is shown in the record. (R. 154)

On one occasion, Mr. Heathcock said to him:

"* * * there is no reason for us to settle this case with you. * * * You are demanding the policy limits; we have nothing to lose by trying it." (R. 155)

On another occasion, he said:

"* * * we can't lose; you are asking all the coverage." (R. 155)

He filed a letter dated February 18, 1954, addressed to Mr. Hammond, in which he offered to settle the Mansfield claims for $9,750 and the Administrator's claim for $2,750. He sent both the original and the copy by registered mail, return receipt requested. (R. 157, 158) No express or implied withdrawal of this offer is shown by any evidence or circumstance.

On the second morning of the trial, they offered to pay $12,500 for all the cases, but at no time did they ever offer any breakdown of the three cases in separate amounts. Mr. White was informed on many occasions to the effect that he could break the proposed figures down in any way he desired. On one occasion he told Mr. Elam that he would settle all three of the cases for $12,500. (R. 161, 162) In discussing it with them, they would say:

"* * * why, you can break it down any way you want to, we have just got a loss and you can break it down like you want to". (R. 162)

Mr. Heathcock offered $11,000 to settle all three of the cases shortly after White was employed as counsel. That offer was made before he made the offer of $12,500. (R. 168)

There was some time that they stood—White agreeing to take $12,500 and Heathcock offering to pay $11,000. Each time he discussed it with Heathcock, he would say:

"I don't care how you divide it." (R. 169)

He admits that he made a proposition of $12,500 to settle all the cases, but that his offer wasn't broken down as to the different cases. He stated that Mr. Heathcock, during all the negotiations, maintained that he had a good legal defense in the cases but that he, himself, did not think so. He was asked:

"Q. That's not unusual? A. That's always true, but the jury agreed with me." (R. 176)

He stated that his offer of $12,500 had no been withdrawn when they went to trial. (R. 176)

We must remember that the jury in this case is being called upon to determine whether or not bad faith existed on the part of a professional person, in which profession the jurors had no experience whatever. It is a far more tedious matter for determination than the ordinary civil suit for damages, as the issue relates to facts from which bad faith is to be inferred. An examination of the real facts in the case, and the law applicable to such a case, and the issues to be determined, clearly justifies us in looking at the evidence given by Mr. Heathcock which is undisputed, and we are also justified in giving consideration to his qualifications, experience, and practice.

Mr. Fenner Heathcock is a graduate of Columbia University Law School. He began to practice law in Union City in 1921. He has been associated as a partner in the practice of law with some of the distinguished

lawyers of West Tennessee, one of whom was a Judge of the Supreme Court of Tennessee. The firm presently is composed of Mr. Heathcock, as senior partner, and Mr. Elam and Mr. Cloys, and represents locally and territorially, some 35 insurance companies. He is well versed in the law with reference to liability insurance and the rights of the insurer and the insured. His firm is general counsel for the involved defendant company. Claims in which the defendant insurance company is involved, arising in the general vicinity of West Tennessee, are referred to this firm by the "Claims Superintendent". (R. 213)

Certain representatives of the Claims Department of defendant company, who made some investigation in connection with the involved accident and injuries, notified Mr. Heathcock of this accident. A Mr. Rogers who was then stationed at Trenton in Gibson County, made a preliminary investigation and furnished Mr. Heathcock with a copy. Mr. Heathcock instructed him about making future investigations in connection with the involved injury which he did. The file was turned over to Mr. Heathcock by Mr. Pumphrey, Claims Superintendent of the Company, and from that time on he had official charge of the case. He generally had official charge of investigations in regard to this particular company client.

On March 14, 1953, he wrote Mr. Hammond, the plaintiff in this case, the following letter:

"Our firm has been employed by the Tennessee Farmers Mutual Insurance Company to represent ` you in connection with any claims which may be made or suits which may be filed against you by Mrs.

Eva Mansfield and Mrs. Walter Wayne Mansfield for injuries growing out of accident at the Lindenwood School on October 21, 1952. (It is the 21st here but it should be the 31st)

"We have discussed the claims several times with Mr. Keith Rogers, adjustor for the company, so that we are fairly familiar with the facts. Since the accident was caused by a failure of the hydraulic brakes upon your car of which you had no previous knowledge, you would not be liable under the law for any damages growing out of the accident, since you were not guilty of any negligence.

"However, the company is disposed to take a very liberal attitude in regard to these claims and try to work out a settlement of the claims, if a settlement can be made upon a fair and reasonable basis.

"In order that we may have a complete understanding of all facts surrounding the facts, we would like, at your first opportunity, to go over the matter with you in detail here in our office. If you would call us sometime during the middle of next week when you have an opportunity to do so, we would like to have you come in to see us and discuss these claims." (R. 215, 216)

Mr. Hammond responded to that letter by coming into his office personally, and related just what had occurred or, at least, his theory of what occurred:

"I spent sometime there in the office reviewing just how the accident happened. He undertook to go over the accident with me and tell me just how it happened. He told me that it was an unavoidable

accident; that he was not conscious of any negligence whatsoever; there was nothing he could. have done to avoid the accident. He said that the brakes had never given him any trouble on the car and had given no member of the family any trouble to his knowledge. He said on the night of the accident the brakes worked perfectly on several occasions before he reached the schoolhouse; he and his wife had set out from home to attend a Halloween party; he used the brakes as he backed the car there in the front yard; he used the brakes again as he made the very sharp turn at the Lindenwood Schoolhouse. He said that he was going very slowly toward the schoolhouse, the car. just barely rolling, the ground sloping a little bit south toward the schoolhouse, and he was looking for a place to park and at first he thought he saw one near the school, but he saw he couldn't get in that one. He determined to let his wife out and park his car in the yard. He said as he was about a car length from the schoolhouse steps— he was back on the drive with the front end of the car pointed at an angle toward the schoolhouse steps—he undertook to apply his brakes; that at the same time he put his foot on the clutch and to his consternation the brake pedal went to the floor; that he had absolutely no brakes; that he had time to do nothing but shout a warning, 'look out, my brakes failed' or something like that; and the car rolled down and up the steps and against the two Mrs. Mansfields who had, with Walter Wayne Mansfield, come out from behind cars parked near the steps, causing the injury in question. That was the explanation he made of the accident. He said that

he didn't have time to do anything in a space of only 10 to 12 feet at the time he undertook to apply the brakes; he just rolled down and up the steps.'' (R. 217, 218)

Mr. Hammond testified in the original trial and in this trial, in substance, exactly what Mr. Heathcock says he related to him about how the accident occurred. If This Statement Is True, and Hammond is shown to be a reputable citizen, Mr. Heathcock had a right to assume that Hammond had a complete defense to any action filed against him. In substance, that defense was that—

There was a sudden failure of hydraulic brakes on his automobile, which were in a good state of repair and had never failed before, as he started into the curb around the school building and all he could do was to shout a warning: ''look out, my brakes failed''. (R. 218)

All members of the Hammond family who were in the car with Mr. Hammond were interrogated and corroborated Hammond's statement. The car had been sold to Mr. Hammond by his son who informed Mr. Heathcock that such brake failure had never occurred before. The son, immediately after the accident, drove the car into the yard of O'Neal Johnson. He then carried it to Bob Ingram, a mechanic, with instructions to fix the brakes. The brakes again gave trouble and he carried it back to that same mechanic who put on a new master cylinder. Thereafter, it gave no trouble. The daughter of the plaintiff Hammond, who had driven the car and worked at Reelfoot Packing Company in Union City, said that she had never had any trouble, whatever, with the brakes on this car prior to the accident. Mrs. Hammond, who had also driven the car, made the same statement. The

day the car was carried to the mechanic, Bob Ingram, this daughter of the plaintiff got it after it had been examined by Ingram, started home, and the brakes suddenly failed. Hammond was informed about that and he drove the car around "a square mile", and he said that on three of those corners, as he was making the turn, the brakes functioned all right but on the 4th corner the brakes failed, he ran into a ditch, and the next day he sent it in to be repaired.

Mr. Heathcock investigated the matter with the mechanic, Bob Ingram, and was informed by Ingram that the first time he examined it, he could find nothing wrong with the brake, and when the car came back to him with the explanation from the Hammond family that the brake had again failed, he simply changed the master cylinder and put in a new one, and no trouble was ever experienced after that time.

Mr. Heathcock stated that he had interviewed everybody that he thought might know anything whatever of the accident or could shed any light on it, and no information was received inconsistent with the statement Hammond had made to him about the sudden failure of the brakes. He states that he investigated from several other mechanics, telling them just what Hammond had said about the failure of the brakes, and sought information whether that could have happened and each of the mechanics said that it could easily happen. He was informed by each mechanic that "a little piece of grit that would get under this rubber diaphragm or valve in the master cylinder which would permit the air or fluid to go by, would cause them to fail, and they said it was entirely possible a set of hydraulic brakes would

function perfectly, fail, and then the line would later function perfectly again.'' (R. 222) Mr. Heathcock stated that he was advised by the claim agents of the insurance company that they had tested the brakes while the car set out in Johnson's yard and he put his foot on the brake pedal and it went clean to the floor, showing no braking power whatever. These claim agents were not used as witnesses in the original trial, as explained by Mr. Heathcock, for the reason that it was not proper or common practice to put representatives of insurance companies on the stand to testify in such cases. He made his report to the company, giving his legal opinion as well as the facts revealed by his investigation, and he stated that he advised the company that in his opinion there was no liability. His legal opinion submitted says that:

"The owner of an automobile is not guilty of negligence if the hydraulic brakes of his car suddenly fail without previous warning and if the automobile was being driven at the time with reasonable care and caution.'' (R. 228)

In support of that proposition, he cited both text law and case law, giving style, etc. of several cases.

His next proposition, he stated as follows:

"An injury is not actionable if it could not have been foreseen or reasonably anticipated.''

In support of that proposition, he properly cited several Tennessee cases.

He testified that he advised the Company that under the law of Tennessee known as the "Emergency Doc-

trine'', when applied to this case, he could see no liability.

The record reveals that he talked to every witness whom he could find that was present at the time of the accident, and while none of them advised him or told him that one Beverly Reed was present, he learned that she had been subpoenaed. He went to see her on one or two occasions. She refused to talk and on instructions from her grandfather, she would tell him nothing. This is verified by the testimony of plaintiff Hammond and Beverly Reed.

In giving consideration to the matter of settlement, of course his Opinion with respect to legal liability, or the care exercised by Hammond in driving his automobile at the time of the accident, naturally and properly and with no bad faith toward either Hammond or the insurance company, influenced him in making recommendations of settlement. The severity of the injuries were taken into consideration, but having first assumed that there was no legal liability, upon fair and unbiased opinion, naturally his offers of settlement were influenced to a great extent.

This record to me reveals the undisputed fact that the law firm representing the insurance company and Hammond, the insured, were honestly and fairly of the opinion that there was no liability on the part of Mr. Hammond, based upon everything that had transpired from the moment they had called Mr. Hammond into the office and he consented that they represent him as well as the insurance company.

As to item (2) above, it seems that the majority Opinion rests its conclusions on the right of the jury to find bad faith on the part of the defendant because of the letter written by counsel and signed by Hammond after the original trial, the verdict of the jury, and the judgment of the Court thereon, and while motion was pending for new trial. This letter is carried in full in the original Opinion 306 S. W. (2d) 22. Following the quotation of that letter into the majority Opinion, it is stated:

"In that situation, the insurance company was certainly gambling with the insured's money, or liability, in an attempt to save its own. It is apparent to us, also, that in that situation, where Messrs. Heathcock & Elam were acting in the dual capacity of attorneys for the insurance company and for W. N. Hammond, they gave priority to the interests of the insurance company, rather than to those of Mr. Hammond. This situation, therefore, falls within the spirit if not the letter of language used by Judge Caruthers in the case of Tisdale v. Tisdale, 34 Tenn. 596, 608, 64 Am. Dec. 775, part of which is quoted with approval by Mr. Justice Samuel Cole Williams in Pemiscot County Bank v. Central State National Bank, 132 Tenn. 152, 158, 177 S. W. 74."

Then follows the statement referred to in the Opinion of Mr. Justice Williams in Pemiscot County Bank v. Central State Nat. Bank, supra.

I can see no similarity whatever in the Opinion of the Supreme Court in the case of Daugherty v. Stuyvesant Insurance Co., 169 Tenn. 300, 86 S. W. (2d) 1095, wherein the Supreme Court permitted a bad faith penalty

against the insurance company because its only contention was that the transfer of notes secured by a lien on the property destroyed operated as a transfer of title in violation of the provisions of the policy.

Furthermore, this letter was written after the verdict and judgment, and the declaration in this case nowhere alleges that bad faith existed in connection with the action of counsel or agents of the Company after the original verdict and judgment. The letter, to me, does not represent negligence on the part of counsel, nor is it any evidence of bad faith in connection with the activities of counsel occurring at any time prior to the original verdict and judgment. Certainly, in view of the fact that the jury had returned a verdict of only $500 in favor of Mansfield as Administrator of the estate of his mother, whose leg was broken in the same accident, and counsel feeling that they had acted fairly toward both Hammond, the insured, and the insurance company, it could not be said that the letter was any evidence of prior bad faith. At most, it could only be said that it was an error of judgment to withdraw that part of the motion for a new trial which dealt with the question of the misconduct of the jury.

As to item (3) above, it is necessary to remember that the gathering on that occasion at the Lindenwood Community school building where this accident occurred, was on the night of Halloween. Some of the parties present were wearing masks. Beverly Reed was asked:

"Q. What kind did you have on? A. It was black. I was a witch—I was dressed as one rather.

"Q. Well, now, how much of your eyes did that cover—that mask? A. It didn't cover my eyes, it has openings and I saw through them. I saw with my eyes out of the openings." (R. 137)

Beverly Reed did not know the name of the child, or rather she had never seen her before, who said she was sitting by her on the banister of the steps at the school building at the time of the accident. In that regard she was asked and answered:

"Q. Did she live there in the community? A. I don't know who she was; I don't know where she lived; I don't remember who she was.

"Q. Did you tell Mr. White about her? A. I did. He asked me if anyone was sitting there and I said, "yes, but I don't remember who". (R. 136)

\*    \*    \*    \*    \*    \*

"Q. I thought you might have seen her after that whether you knew who she was or not. A. She was dressed up and had a false face on." (R. 137)

With reference to the visit made to interview her by Mr. Heathcock and others, she was asked:

"Q. You knew Mr. Heathcock and Mr. Elam came out to talk to you? A. Yes.

"Q. And your grandfather declined to let them talk to you? A. Yes. He was afraid they would get me mixed up and I was going to say what I said on the witness stand.

"Q. How long before Mr. White came out was it Mr. Heathcock came out? A. I don't know.

"Q. Was it before Mr. White came out? A. It was not before.

"Q. Was it after Mr. White came? A. Yes." (R. 139)

This child positively swore that Mrs. Mansfield, at the time she was hit by the car, was on the third step, facing the car, and said: "Don't hit me!" (R. 140) Hammond, the plaintiff, testified that he went with Heathcock and Elam to interview the child, Beverly Reed. On direct examination, he was asked and answered:

"Q. Did they interview the little girl, Beverly Reed? A. No, we went to see her and her grandfather wouldn't let her talk to them." (R. 49)

Under the circumstances revealed by the testimony of the Reed child and Hammond, is it possible to find any lack of diligence that could be evidence of bad faith on the part of the lawyers or the agents of the insurance company with respect to this witness?

As to item (4) above, I do not agree with the majority Opinion that there was considerable doubt respecting the issues of bad faith on the part of counsel, because of the Chancery suit by the same Insurance Company against the same Hammond, reported in 290 S. W. (2d) 860. That case was disposed of on plea in abatement without any proof being offered. The Supreme Court rested its decision in that case upon the statement made by it in the case of Aetna Life Ins. Co. v. Bellos, 158 Tenn. 554, 13 S. W. (2d) 795, 797, 14 S. W. (2d) 961, wherein that Court said:

"In the instant case we find no ground on which complainant can force defendant into a forum, and at a time, of complainant's choosing, and thus compel defendant to litigate the issue of the suicide of her husband."

And further it was said:

"The case in this aspect is not one for a declaratory judgment, even were the bill with its prayer framed to this end. The principles governing declaratory judgment proceedings, announced in Newsum v. Interstate Realty Co., 152 Tenn. [302] at pages 304, 305, 278 S. W. 56, 57, apply here. Disputed facts would here be determinative issues, rather than 'construction of definitely stated rights, status, and other relations, commonly expressed in written instruments,' etc."

Following that reference in disposing of the case then before it, the Supreme Court said [290 S. W. (2d) 863]:

"The foregoing statement is clearly applicable to the case at bar. The complainant by this suit anticipates that a tort action will be instituted against it based upon its alleged lack of good faith in negotiating a settlement, to Hammond's damage. In seeking a declaratory judgment the complainant would force the defendant into a forum, and at a time of complainant's own choosing and compel him to litigate his tort action in the Chancery Court. *For this reason the Chancellor was right in dismissing the complainant's bill.* Moreover, it cannot be said, under the admitted facts of this case, that the learned Chancellor abused his discretion or failed to act with

proper caution in exercising the discretion which the law imposed upon him." (Emphasis added.)

With that statement from the Supreme Court in that case, it seems to me unfortunate that the majority Opinion in the instant case, with which I do not agree, makes the following reference and recitation:

"Evidently able counsel for defendant in the instant case must have thought that there was considerable doubt about the issues involved in the instant case, because they undertook to forestall this litigation by trying to obtain a declaration of their rights and liabilities in a suit filed in the Chancery Court of Obion County under provisions of the Declaratory Judgment Law of this State. In that suit the learned Chancellor refused to entertain the suit, because of disputed issues of fact which were determinative of the rights of the parties. This ruling of the Chancellor was affirmed by the Supreme Court in the case of Tennessee Farmers Mutual Insurance Co. v. Hammond, 200 Tenn. 106, 290 S.W. (2d) 860. The parties in that case were the same as the parties in the instant case. The disputed issues of fact which caused the Chancellor, in that case, to refuse a declaratory judgment, have, in the instant case, been resolved by the jury's verdict against the defendant, Tennessee Farmers Mutual Insurance Company."

I can see no reason whatever for a reference to that case when all the Chancellor had before him at the time he decided it on the pleadings was the original bill and pleadings, and of course the pleadings were all the Supreme Court had before it except the Opinion and

Decree of the Chancellor based upon the pleadings. Besides, the Trial Judge in the case at bar held that evidence concerning the Chancery suit was incompetent. With respect thereto, Hammond was asked:

"Q. I believe, Mr. Hammond, that after these judgments were obtained by you and sometime around August, 1955, the Tennessee Farmers Mutual Insurance Company filed a bill against you in the Chancery Court of Obion County, Tennessee? A. That's right.

"Q. I hand you what purports to be a copy of that bill and ask you to examine it and see if that is a copy of the proceeding filed against you in the Chancery Court of Obion County, Tennessee?"

There was an objection to the introduction of that bill and after considerable argument, the Court ruled on the objection as follows:

"The Court holds that it is something that occurred after the judgments in these cases and could not shed light on the question of good faith."

As to item (5) above, in an effort to show that Mr. Hammond had made some statements which would convey the inference that he knew he was negligent in the operation of his automobile at the time of the injuries on which the Mansfield suits were based, to Heathcock and Elam when he gave them a statement as to how the accident occurred, which were not actually put into his statement and in his testimony, he was asked:

"Q. Did you state to either one of them something not placed in the statement and which was not testified about on the original trial? A. I did.

"Q. When was that? A. I made the statement that I could have just kept going and not turned in and *probably* avoided the accident. (Emphasis added.)

"Q. You mean kept going straight? A. Straight ahead and not turned into the steps.

"Q. What did they say? A. Mr. Elam told me never to let him hear me say that again." (R. 58)

The majority Opinion on page 6, referring to the failure of the brakes, states:

"In any event, there was ample evidence in the damage suit case, to sustain the jury's verdict in that case, even if it be assumed that the brakes did suddenly and unexpectedly fail to work. On that theory, this Court affirmed the verdicts of Mrs. Helen Mansfield and of Walter W. Mansfield. See Hammonds v. Mansfield, 41 Tenn. App. 515, 296 S. W. (2d) 652. One example of this character of evidence is the testimony of W. N. Hammond, himself, given at both trials,—that he might have avoided the accident by steering his automobile into other parked cars. In the instant case, he testified that in making his original statement to Messrs. Heathcock and Elam who, as attorneys for the Tenn. Farmers Mutual Ins. Co., represented him in the damage suit case, that he made this observation but was told by Mr. Tom Elam not to let him hear him say that again."

On page 58 of the record in the instant case, I have quoted the above statement. I find no such statement in the testimony as attributed to Mr. Hammond, and to which Mr. Elam replied: "Never let me hear you say

that again'',—except that which is quoted in question and answer form above. It goes without saying that there is absolutely nothing in that statement which indicates negligence on the part of Hammond or bad faith on the part of Heathcock & Elam. Certainly if Hammond had not turned into the steps, but gone straight ahead, the accident would not have occurred, but he does not say that the idea occurred to him at the time of the accident, and such statement affords no inference that it did. The construction placed on what Hammond said in that regard, in the majority Opinion, as I construe it, is far from what the man meant, and Mr. Elam's response to it is nothing more than saying to Mr. Hammond that such expression was meaningless, because it was foolish. Certainly Mr. Elam knew that if Hammond had gone straight on, no accident would have happened.

On cross-examination, he said he never gave any statement about the case to Mr. Elam at all, but that all of his statements were made to Mr. Heathcock, "except this statement I made in there". (R. 59) Again on cross-examination, Mr. Hammond was asked about this statement and replied:

"A. I made the statement that I might have kept driving on and avoided the accident—straight on instead of turning into the steps." (R. 59)

In this same connection, when he was cross-examined about when such statement was made, he was asked if he was not under oath when he gave the statements in writing to Heathcock & Elam, he said:

"Q. You were under oath when you testified in this case on the trial of it? A. Yes.

"Q. Did you tell the truth? ·A. I did.

"Q. The whole truth and nothing but the truth? A. I did.

"Q. Did you testify that on your examination in the trial of this case? A. Not here.

\* \* \* \* \* \*

"Q. Did you testify on the trial of the case that you thought this might have been avoided — you might have avoided the accident by going a little further down? A. No.

\* \* \* \* \* \*

"Q. You did testify in the case that was an unavoidable accident; that you couldn't help it? A. Yes.

"Q. And it was, wasn't it? A. Yes." (R. 60, 61)

As to item (6) above, I do not agree with the majority Opinion in overruling Assignment of Error XV by defendant. This Court weighs the statements made by trial judges relative to verdicts and judgments thereon, in order to determine whether a trial judge actually exercised his function as a 13th juror. The language used by the learned Trial Judge clearly indicates a dissatisfaction with the verdict of the jury, because of the fact that this record is clear that all of the alleged bad faith, if it could be said any existed, can only be found in the action of counsel Heathcock as he dealt

with defendant in the dual capacity of his counsel and counsel for his insurer. Taking the entire statement of the Trial Judge together, but particularly the statement—

"* * * I thought of it at various times and I come to the conclusion that this matter should be determined by the appellate courts. I appreciate the fact that what a judge says in passing on these motions is considered by the Appellate Court but I only have one remark to make for whatever it *may be considered* or *not considered*, I think this case should be determined by them in this record but I will make this one affirmative statement that Mr. Heathcock, in my opinion, was in no way dishonest and I do not think this record discloses that. So, the motion will be overruled so that the Appellate Court may be able to determine this matter,"

It is clear that the Trial Judge was dissatisfied with the verdict of the jury. The learned Trial Judge did not say —may be able to determine this matter without another trial before me—for he well knew that a wayside bill of exceptions could be preserved and then the Appellate Court would determine this very matter. To me his expression is clear that he was dissatisfied with the verdict. Had he said nothing, we of course could assume that he was satisfied with the verdict.

The Trial Judge in the case of McLaughlin v. Broyles, 36 Tenn. App. 391, 396, 255 S. W. (2d) 1020, 1023, said:

"In these cases where the evidence is in sharp conflict the Court does not feel that he has a right to interfere with the verdict of the jury, and overrules the motions."

When proper interpretation is given to what the learned Trial Judge in the case at bar stated, to me it is clear that his intention, in making that statement, is identical with what the Trial Judge said in the case of McLaughlin v. Broyles, supra. To me it is as plain as if the Trial Judge had said: No dishonesty has been proven on the part of Mr. Heathcock and the issues of bad faith are so sharply in conflict, that they should be determined by the appellate courts upon the verdict of the jury without interference upon the part of the Trial Court.

In my opinion there is nothing in the case of Aycock Hosiery Mills v. Maryland Casualty Co., 157 Tenn. 559, 11 S. W. (2d) 889, which affords any basis for the reasoning in the majority Opinion in this case. The majority Opinion in the case at bar fairly sets out what occurred in that case and quotes what appears to be the crux upon which the Supreme Court held the Insurance Company liable in the common law civil action growing out of the workmen's compensation case. When suit was brought under the Workmen's Compensation Act, the Opinion says:

"It (the insurance company) assumed the defense of the suit brought by the employee under the Compensation Act to the exclusion of the defendant."

That statement followed the statement that it was "the duty of the casualty company to exercise, not only good faith, but *ordinary care.*" (Emphasis added.) Counsel for the company in that case, from the statement made by the father of the injured employee on the stand as a witness, learned that the father claimed that his son was employed in violation of the child labor law because, he

114

contended, no Employment Certificate had been procured. At that point, counsel who represented the insurance company and also the insured, completely abandoned the rights of the insured by amending the defense to show illegal employment of the son. The case was continued and before being tried, the father brought suit in a common law action for injury to his son. In the meantime, the court house burned and the insured was unable to prove that the injured employee was legally employed. The claim could have been settled as provided by the Workmen's Compensation Act which fixes the amount of the coverage.

There is no comparison, in my opinion, in the action of counsel in the instant case and the action of counsel in the Hosiery Mills case, who represented the Insurance Company and the insured. No statute fixed the amount of recovery in the instant case, so it was a matter of judgment with respect to the severity of the injury. In the instant case, there was no statute which deprived the defendant of the right to show there was no negligence on his part. The reverse was true in the Hosiery Mills case. There, counsel for the insurer and the insured requested the continuance when the above referred to proof was offered by the father, or acquiesced in it, so the Opinion says,—

"to enable it to plead and set up this new fact. The effect of its establishment would have been to absolve the insurance company of liability measured by the schedules of the Compensation Act and to fasten an absolute liability upon the insured employer measured by rules of the common law." [157 Tenn. 559, 11 S. W. (2d) 891]

The Opinion further says:

"At that time witnesses were available to contradict the statement of the petitioner that his son was not legally employed by complainant."

The Opinion then sets out the fact that the Superintendent of the Hosiery Mills, hearing of such action by the Casualty Company, protested to its attorney at that very time and charged bad faith in handling the claim. The Casualty Company then—

"abandoned this new defense, but retained control of the case for the purpose of having judicial interpretation of the meaning of section 2(d) of the Compensation Act."

It can clearly be seen that counsel for the Company assumed an absolutely inconsistent and unfaithful attitude toward his client, the insured, in that case. No such situation existed in the instant case. Furthermore, Mr. Aycock, President of the Hosiery Mills, testified about a conversation he had with Mr. Hitzfield, in which he said:

"I told him (referring to Mr. Hitzfield) that it was cheaper to settle the case than to continue the fight and if he would not pay it I would, and he insisted on continuing the fight in order to establish a precedent."

In other words, it simply showed the bulldog determination and unreasonably assumed position of counsel for the Insurance Company. Not so in the instant case.

I do not think the case of Southern Fire & Casualty Co. v. Norris, 35 Tenn. App. 657, 250 S. W. (2d) 785,

furnishes authority for the majority Opinion in the instant case. In the Southern Fire & Casualty Co. case, 35 Tenn. App. at page 662, 250 S. W. (2d) at page 787, it is said with approval of the charge in the Lower Court, that:

"It will be noted that the charge placed the burden on the insured of establishing bad faith and a dishonest motive before recovery could be allowed."

In that case it is shown that no effort was made toward a settlement until shortly before the trial. It is said:

"A day or two before the case was set for trial plaintiff, upon inquiry made by counsel of his own selection, was told for the first time that the claim could have been settled for $9,500."

In discussing what was said and done, the Opinion of the Court further recites the fact that:

"It is clearly shown that when defendant declined to accept the offer to settle for $9,500 or to pursue the offer to recommend such a settlement if it so understood the offer, *it had before it evidence that Davis would be able to show on the trial a condition of total and permanent disability and that a great preponderance of the evidence would show a case of liability.*" (Emphasis added.)

That Opinion further states:

"Defendant had neglected to learn Davis' true condition until a trial was imminent and had failed to learn of the existence of a most material witness. It had declined to accept an offer of compromise within the limits of its policy liability and, failing

to advise plaintiff of the offer, had authorized a counter offer of such an amount that Davis apparently considered it a rejection of his own offer which he promply increased to $12,000. Although then fully aware of the seriousness of its insured's position both on the issue of liability and the probable amount of the recovery and although willing to pay $10,000 it made no further effort to compromise and proceeded to trial suggesting that plaintiff pay $2,000 and settle on the basis of Davis' last offer."

Such was not the circumstance in the case at bar. Counsel for the Mansfields admits that he offered to settle the claims—that is, the claim of Mrs. Mansfield, her husband, and the claim of Mansfield as Administrator of his mother's estate (all three of the cases) for $12,500.

The Reed girl witness would not tell counsel for the insurance company and Hammond, what her version of the situation was, and during the first day of the trial when it was known, (that is, what the testimony of the Reed child would be), they offered to pay $12,500, which offer was declaimed by letter directed to Hammond, copy of which was turned over to Heathcock & Elam, but before that date the offer to settle at $12,500 had not been withdrawn by plaintiff's counsel

It seems to me that if the Company in the instant case is to be held liable for this excess judgment over and above $10,000 single injury liability, bad faith must be assumed only from the fact that the same attorneys represented the insurer and the insured in accord with the contract of insurance. To me it is a dangerous precedent to set to be followed in such cases. Counsel

are not infallible. They are not all-wise. Attorneys who have tried cases before civil juries and who are on opposite sides of the case have a right to assume that, after a careful examination, investigation of both law and fact, and experience as trial lawyers, their respective positions are correct, without being charged with bad faith when a jury returns a verdict against their honest opinion as to results.

In the case of Hammonds v. Mansfield, 41 Tenn. App. 515, 296 S. W. (2d) 652, 657, heard by this Court, the learned Opinion being prepared by Judge Carney, we said:

"In the case at bar, we cannot say that the evidence is so uncontroverted that all reasonable men must come to the conclusion that the defendant was not guilty of any negligence causing the plaintiff's injuries and in our opinion the case was properly submitted to the jury and Assignments of Error I through IV must be respectfully overruled."

We also said:

"If we concede for the purpose of this discussion that the defendant Hammonds' hydraulic brakes did fail just as he testified; to wit, that he headed directly toward the steps slowly and applied his clutch pedal and his brake pedal simultaneously and the brake pedal went all the way to the floor showing that he had no brakes at all; we still think there was ample evidence *from which the jury could find that he was guilty of proximate negligence in heading his car straight into the steps instead of following the regular course of the circular driveway* and also in

failing to make any effort to avoid striking the plaintiffs after he discovered that he had no brakes." (Emphasis added.)

It is very clear from a reading of our Opinion in those consolidated cases, that if the jury had found in favor of the defendant there would have been ample evidence to have supported such a verdict.

In the case of Life & Casualty Ins. Co. of Tenn. v. Smith, 51 Ga. App. 122, 179 S. E. 744, the Court of Appeals of Georgia said:

" 'The terms "bad faith" are not the equivalent of actual fraud, but they mean any *frivolous or unfounded* (italics ours) refusal in law or in fact to comply with the requisition of the policyholder to pay according to the terms of his contract and the conditions imposed by statute.' Cotton States Life Ins. Co. v. Edwards, 74 Ga. 220. 'Probable cause for refusing payment will negative the imputation of bad faith, and without such probable cause refusal will be at the company's peril.' Travelers' Ins. Co. v. Sheppard, 85 Ga. 751, 12 S. E. 18; Georgia Life Ins. Co. v. McCranie, 12 Ga. App. 855, 860, 78 S. E. 1115."

In that case of Life & Casualty Ins. Co. v. Smith, supra, there was a jury verdict in favor of Smith. Commenting upon the facts of the case, that Court further said:

"Under the above principles, the evidence in the case at bar was amply sufficient to show lack of bad faith on the part of the insurance company in refusing payment of the insured's claim. There was ample evidence *upon which the jury might have*

*based a verdict in favor of the defendant's conten-
tion.* Judgment is therefore affirmed upon the con-
dition that the damages and attorney's fees be
stricken. Otherwise the judgment is reversed."
(Emphasis added.)

A careful reading of our Opinion by Judge Carney
shows very clearly that there was ample evidence in the
case "upon which the jury might have based a verdict in
favor of the defendant's contention." Just as was said
in the Georgia case.

In the case of Life & Casualty Co. of Tenn. v. Freemon,
80 Ga. App. 443, 56 S. E. (2d) 303, 304, there was a
verdict in favor of Freemon upon the policy of insurance,
plus interest, plus attorney's fee. This interest and
attorney's fee is based upon the bad faith statute in the
State of Georgia. The suit was brought by the mother
of the deceased to recover the life insurance policy
proceeds which contained a provision that there was no
liability in the event the insured came to his death by
reason of operating a motorcycle. It was the contention
of the defendant that such had caused his death. The
Court said:

"The jury would have been authorized, under the
evidence, to have found that under all the facts and
circumstances of the case the insured came to his
death by reason of riding or operating a motorcycle.
On the other hand, however, the jury were author-
ized under all the facts and circumstances of the
case, to find that the insured did not come to his
death by reason of riding or operating a motorcycle.
This being true, the verdict of the jury was author-
ized by the evidence. The trial court approved the

verdict. This court is without authority to set it aside, insofar as the principal amount of the policy and interest thereon of the recovery are concerned.

"We come next to consider whether the portion of the judgment for attorney's fees should stand under the record in this case. The burden was on the plaintiff to show bad faith on the part of defendant in refusing to pay the claim within sixty days after demand. In Pearl Assurance Co., Ltd. v. Nichols, 73 Ga. App. 452, 37 S. E. (2d) 227, 230, this Court held in 'Refusal' of an insurance company in "bad faith" to pay means in Georgia a frivolous and unfounded denial of liability. If there is any reasonable ground for contesting the claim, there is no bad faith. Though ordinarily these are questions for the jury, *if there is no evidence of such frivolous or unfounded refusal to pay, or if the question of liability is a close one, the court for the furtherance of justice should see to it that a verdict which illegally carries a penalty for bad faith is not allowed to stand.'* " (Emphasis added.)

That Court thereupon held no bad faith to exist and reversed the verdict of the jury in that respect.

It should be said that bad faith is a state of mind which is evident by acts inconsistent with acts of good faith. In other words, bad faith is the opposite of good faith. Good faith on the part of counsel for the Insurance Company and for Hammond, required them to make an investigation of the facts and apply their knowledge of the law thereto and their experience as lawyers in the trial of such cases, without partiality to either the insurer or the insured. When we view the evidence in

this case, giving consideration to the positive testimony and the circumstances related by the witnesses, discarding evidence where there is any countervailing evidence whatsoever, I cannot bring myself to conclude that there is any evidence upon which it could be said that counsel, or the agents of the insurer, acted in bad faith toward the insured.

I have not mentioned in this Opinion, the extent of the injuries of Mrs. Helen Mansfield, for I do not think we get to that point. This case turns upon the proof, conclusive to my mind and uncontradicted, that upon the diligent investigation shown to have been made, counsel had a right to assume that there was great probability that the jury would return a verdict in favor of Hammond.

It is my Opinion, therefore, that the two Assignments of Error, one with respect to the failure of the Trial Judge to exercise the function of a 13th juror, and the other with respect to the fact that there is no evidence to support bad faith, should have been sustained, the judgment of the Court thereon set aside, and this case dismissed.

On Petition for Certiorari

Certiorari denied by Supreme Court. Concur in result.